Exhibit 16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., and PDV HOLDING, INC., | |
| Plaintiffs, | |
| - against - | Case No: 19-cv-10023-KPF |
| MUFG UNION BANK, N.A. and GLAS AMERICAS LLC, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE ......................................... 4

I.     Plaintiffs and Their RECONSTITUTED Boards of Directors ........................... 4

II.    Defendants and the Beneficial Holders of the 2020 Notes ................................. 6

III.   The Exchange Offer and the 2020 Notes Transaction ........................................ 6

IV.   The Economic Outcome of the Exchange Offer for PDVSA and Exchanging Noteholders ......................................................................................................... 8

V.    Venezuela's Constitutional Requirement of Prior National Assembly Authorization for National Public Interest Contracts with Foreign/Non-Domiciled Counterparties .......................................................................... 9

VI.   The National Assembly's Public Opposition to the Exchange Offer and Explicit Rejection of the Pledge ...................................................................................... 10

VII.  Media Reporting and Analyst Commentary Regarding the National Assembly's Opposition to the Exchange Offer and Associated Invalidity Risk ................... 13

VIII. The Subjugation of the National Assembly and the Supreme Tribunal by the Chávez and Maduro Regimes ............................................................................ 14

IX.   The U.S. Government's Recognition of the National Assembly and Interim President Guaidó ................................................................................................. 17

ARGUMENT .................................................................................................................... 18

I.     The National Assembly's Official Actions Withholding Authorization of the Transaction Documents and Declaring the 2020 Notes Transaction Invalid are Acts of State that cannot be "Overruled" by a U.S. Court ................................ 18

II.    The Transaction Documents are Invalid, Illegal, Null and Void *Ab Initio*, and Unenforceable Under Applicable Venezuelan Law ....................................... 23

      A.   Venezuelan Law Governs the Validity of the 2020 Notes Transaction .............. 23

      B.   Comity Favors Deferring to the Legitimate Venezuelan Government's Interpretation of its Own Laws .............................................................. 28

      C.   The Transaction Documents Are National Public Interest Contracts That Required Prior National Assembly Authorization Under the Venezuelan Constitution ...................................................................... 29

      D.   The Lack of Required National Assembly Authorization Precluded Contract Formation and Valid Legal Existence of the Transaction Documents .......................................................................... 31

      E.   National Public Interest Contracts Need Not Include the Republic as a Party .................................................................................... 32

# TABLE OF CONTENTS
(continued)

**Page**

III.    Defendants' Defenses Fail as a Matter of Law ..................................................... 39

IV.    Defendants' Counterclaims Fail as a Matter of Law ...................................... 42

CONCLUSION .............................................................................................................. 45

APPENDIX A ................................................................................................................. 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
    425 U.S. 682 (1976) ................................................................................21

*Allied Bank International v. Banco Credito Agricola de Cartago,*
    757 F.2d 516 (2d Cir. 1985) ...............................................................22,23

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.,*
    138 S. Ct. 1865 (2018) .........................................................................29

*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.),*
    528 F.3d 162 (2d Cir. 2008) ................................................................29

*Banco de Espana v. Fed. Reserve Bank of New York,*
    114 F.2d 438 (2d Cir. 1940) ................................................................21

*Banco Nacional de Cuba v. Sabbatino,*
    376 U.S. 398 (1964) ............................................................................19

*Estate of Leventhal ex rel. Bernstein v. Wells Fargo Bank, N.A.,*
    No. 14 Civ. 8751 (ER), 2015 WL 5660945 (S.D.N.Y. Sept. 25, 2015) ..................43

*Braka v. Bancomer, S.N.C.,*
    762 F.2d 222 (2d Cir. 1985) ................................................................23

*Briarpatch Ltd., L.P. v. Phoenix. Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004) ................................................................43

*Carmine v. Murphy,*
    285 N.Y. 413 (1941) ...........................................................................43

*City of Zanesville, Ohio v. Mohawk Data Scis. Corp.,*
    97 A.D.2d 64 (4th Dep't 1983) .............................................................41

*Cohen v. Krantz,*
    227 A.D.2d 581 (2d Dep't 1996) ..........................................................41

*Cornea v. U.S. Attorney Gen.,*
    771 F. App'x 944 (11th Cir. 2019) .......................................................30

*Defendants' Answers and Counterclaims,*
    Case No. 1:19-cv-10023-KPF, Dkt. No. 40 (S.D.N.Y. Dec. 18, 2019) ...................6

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp.3d 393 (S.D.N.Y. 2018)......................................................................41

*Draper v. Georgia Props.*,
    Inc., 230 A.D.2d 455, 460 (1st Dep't 1997), *aff'd*, 94 N.Y.2d 809 (1999) ............................40

*Fabrizio & Martin, Inc. v. Bd. of Educ.*,
    290 F. Supp. 945 (S.D.N.Y. 1968).......................................................................43

*Faison v. Lewis*,
    25 N.Y.3d 220 (2015) ..................................................................................42

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*,
    809 F.3d 737 (2d Cir. 2016).........................................................................19,29

*First Nat. City Bank v. Banco Nacional de Cuba*,
    406 U.S. 759 (1972).....................................................................................34

*Hall & Co. v. Continental Cas. Co.*,
    34 A.D.2d 1028 (3d Dep't 1970), *aff'd*, 30 N.Y. 517 (1972) ...................................28

*Hausler v. JP Morgan Chase Bank, N.A.*,
    127 F. Supp. 3d 17 (S.D.N.Y. 2015)...................................................................23

*Highland Capital Mgmt. LP v. Schneider*,
    607 F.3d 322 (2d Cir. 2010)............................................................................40

*Impact Fluid Solutions et al v. Bariven S.A. et al*,
    Civ No. 4:19-cv-00654, Dkt. No. 55 (S.D. Tex. May 20, 2020) ...................................6, 35,46

*Jimenez v. Palacios*,
    No. 2019-0490-KSJM, 2019 WL 3526479 (Del. Ch. Aug. 2, 2019)..............................*passim*

*Kashef v. BNP Paribas S.A.*,
    925 F.3d 53 (2d Cir. 2019)..............................................................................21

*Konowaloff v. Metro. Museum of Art*,
    702 F.3d 140 (2d Cir. 2012)..........................................................................19,20

*Levison v. Illinois Surety Co.*,
    222 N.Y. 280 (1918)......................................................................................28

*M+J Savitt, Inc. v. Savitt*,
    No. 08 CIV. 8535 (DLC), 2009 WL 691278 (S.D.N.Y. Mar. 17, 2009)................................44

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Michael R. Gianatasio, PE, P.C. v. City of New York*,
    53 Misc. 3d 757 (N.Y. Sup. Ct. 2016), *aff'd sub nom.* 159 A.D.3d 659 (1st
    Dep't 2018) .................................................................................................43

*NML Capital, Ltd. v. Republic of Arg.*,
    699 F.3d 246 (2d Cir. 2012)...........................................................................42

*Oetjen v. Central Leather Co.*,
    246 U.S. 297 (1918)...................................................................................23,42

*PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*,
    372 F. Supp. 3d 1353 (S.D. Fla. 2019) ...........................................................4

*PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*,
    Case No. 1:18-cv-20818-DPG, Dkt. No. 517 (S.D. Fla. July 23, 2018)........................ *passim*

*PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*,
    Case No. 19-10950 (11th Cir. May 29, 2020) .........................................22

*In re Republic Airways Holdings Inc.*,
    598 B.R. 118 (Bankr. S.D.N.Y. 2019)...........................................................28

*Republic of Benin v. Mezei*,
    No. 06 CIV 870 JGK, 2010 WL 3564270 (S.D.N.Y. Sept. 9, 2010) ....................................27

*Republic of Panama v. Air Panama Int'l, S.A.*,
    745 F. Supp. 669 (S.D. Fla. 1988) .................................................................23

*Roberts v. Criss*,
    266 F. 296 (2d Cir. 1920) ..............................................................................40

*Robertshaw v. Pudles*,
    No. CIV.A 11-7353, 2014 WL 1789307 (E.D. Pa. May 6, 2014) .........................................40

*Saratoga Cty Chamber of Commerce v. Pataki*,
    100 N.Y.2d 801 (2003) ..................................................................................42

*Sardanis v. Sumitomo Corp.*,
    282 A.D.2d 322 (1st Dep't 2001) ..................................................................40

*Stone v. Freeman*,
    298 N.Y. 268 (1948) ......................................................................................40

*Strauss Linotyping Co. v. Schwalbe*,
    159 A.D. 347 (1st Dep't 1913) ......................................................................40

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Tasini v. AOL, Inc.*,
    851 F. Supp. 2d 734 (S.D.N.Y.), *aff'd*, 505 F. App'x 45 (2d Cir. 2012)................................44

*Themis Capital, LLC v. Democratic Republic of Congo*,
    881 F.Supp.2d 508 (S.D.N.Y. 2012)............................................................................27

*U.S. v. Maikel Jose Moreno Perez*,
    Case No. 1:20-mj-02407-JJO (S.D. Fla. Mar. 12, 2020).........................................17

*Underhill v. Hernandez*,
    168 U.S. 250 (1897).....................................................................................20, 21,42

*United States v. Belmont*,
    301 U.S. 324 (1937)..............................................................................................20

*United States v. Pink*,
    315 U.S. 203 (1942)...........................................................................................20,29

*W.S. Kirkpatrick & Co. v. Env'l Tectonics Corp*,
    493 U.S. 400 (1990)..............................................................................................19

*Worthington v. JetSmarter, Inc.*,
    Civ. No. 18-12113 (KPF), 2019 WL 4933635 (S.D.N.Y. Oct. 7, 2019) (J.
    Failla) ...............................................................................................................3,25

*In re Zarro*,
    268 B.R. 715 (Bankr. S.D.N.Y. 2001)...................................................................41

**Statutes**

New York General Obligations Law
    § 5-1401 .........................................................................................................26, 27
    § 5-1401(1).........................................................................................................26

U.C.C.
    § 1-301 ................................................................................................................26
    § 8.................................................................................................................26, 27
    § 8-110 ................................................................................................................26
    § 8-110:6 .............................................................................................................26
    § 8-110(a)(1) .......................................................................................................26
    § 8-110(d)...........................................................................................................26

## TABLE OF AUTHORITIES
(continued)

Page(s)

**Other Authorities**

ALLAN RANDOLPH BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA 132–
33 (2d ed. 2015) ...................................................................................................38

Allan R. Brewer-Carías, *The effects of constitutional sentences in Venezuela*, *in*
22 ANUARIO INTERNATCIONAL SOBRE JUSTICIA 19, 64 (2008) ...............................37

Allan R. Brewer-Carías, *The Principle of Separation of Powers and Authoritarian
Government in Venezuela*, *in* 47 DUQ. L. REV. 837-38 (2009)................................16

ALLAN R. BREWER-CARIAS, THE CONSTITUTIONAL JUSTICE SYSTEM IN THE 1999
CONSTITUTION 86–87 (Editorial Jurídica Venezolana 2000)...................................37

Asamblea Nacional, *Statute to Govern a Transition to Democracy to Reestablish
the Validity of the Constitution of the Republic of Venezuela* (Feb. 5, 2019).......................5,17

Asemblea Nacional, Resolution Dated May 4, 2006 ...................................................35

Asemblea Nacional, Resolution Dated September 24, 2009 ........................................35

Asemblea Nacional, Resolution Dated May 26, 2016....................................10, 12, 30

Asemblea Nacional, Resolution Dated September 27, 2016 .................... 10-13, 20, 22, 33, 39, 44

Asemblea Nacional, Resolution Dated February 9, 2017...........................................34

Asemblea Nacional, Resolution Dated April 24, 2018 ...............................................21

Asemblea Nacional, Resolution Dated October 15, 2019 ......................... 11-12, 20, 33

Carolyn Cui, *Venezuela's PdVSA to Offer to Swap $7 Billion in Debt*, WALL ST. J.
(Sept. 14, 2016)....................................................................................................13

*Debt Issue Under New Decree Will be Void*, EL NACIONAL (VENEZUELA) (Sept.
27, 2016) ..............................................................................................................14

*Default. Few People Seem to Understand Why*, BLOOMBERG (July 4, 2016) .................1

Doug Stanglin, *U.S. recognizes Venezuela opposition leader Juan Guaidó as
president; Russia backs Maduro*, USA TODAY (Jan. 23, 2019)..............................18

Lysaura Fuentes, *Freddy Guevara: Government has proven negligent and
destructive of the economy*, *El Cooperante* (Sept. 28, 2016)..................................14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Letter Dated June 9, 2020 to the Honorable Katherine Polk Failla, United States District Court Judge, from Carlos Vecchio, Ambassador of the Bolivarian Republic of Venezuela to the United States* ..............................................................20, 29, 42

*PDVSA Announces Expiration and Final Results for its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020*, PR NEWSWIRE (Oct. 24, 2016) .............................................................................................................................7

Press Statement, Secretary of State Michael R. Pompeo, Recognition Of Juan Guaidó As Venezuela's Interim President By Several European Countries (Feb. 4, 2019) ....................................................................................................18

Press Statement, U.S. Department of State, *Defending Democracy in Venezuela* (July 30, 2017) ....................................................................................................18

*Third Quarter Assets Under Management Statement*, Ashmore Group, plc (Apr. 16, 2020) ...........................................................................................................6

Thomas W. Wälde and George Ndi, STABILIZING INTERNATIONAL INVESTMENT COMMITMENTS: INTERNATIONAL LAW VERSUS CONTRACT INTERPRETATION, 31 Tex. Int'l L.J. 215 (Spring 1996) ..................................................................25

U.S. Department of State, *U.S. Sanctions on Venezuelan Individuals and Entities* (Press Statement, Feb. 15, 2019) .............................................................17

Venezuelan Constitution
Article 150 ........................................................................................... *passim*
Article 187 ..............................................................................................10, 30
Article 187.9 ......................................................................................... *passim*
Article 233 ....................................................................................................18
Article 245 ....................................................................................................37
Article 303 ........................................................................................... *passim*
Article 335 ...........................................................................................36, 37,38

Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA Petróleo, S.A., ("PDVSA Petróleo"), and PDV Holding, Inc. ("PDV Holding" and, together with PDVSA and PDVSA Petróleo, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for summary judgment on all of their claims and defenses and all counterclaims and defenses of MUFG Union Bank, N.A. ("Union Bank") and GLAS Americas LLC ("GLAS Americas" and, together with Union Bank, "Defendants").[1]

## PRELIMINARY STATEMENT

PDVSA is Venezuela's national oil company, wholly owned by the Republic "[f]or reasons of economic and political sovereignty and national strategy." (Venezuelan Constitution, Art. 303). U.S.-based oil refiner CITGO Petroleum Company is an indirect, wholly-owned PDVSA subsidiary and Venezuela's most economically and strategically important foreign asset. This case will determine whether the legitimate, democratically elected government of Venezuela loses CITGO—the foreign "crown jewel" of its national oil industry—to the hedge funds that provided the illegitimate, authoritarian Maduro regime with a financial and political lifeline by participating in an exchange of PDVSA notes carried out in total disregard of the constitutional oversight powers of the opposition-led National Assembly. In the words of one hedge fund manager a few months earlier, Venezuela under the Chávez and Maduro regimes had become "one of the most miserable, mismanaged, hopeless countries on the planet. But that doesn't mean you can't make money."[2]

---

[1] A chart of the parties' claims and defenses is attached as Appendix A to this memorandum.

[2] Sebastian Boyd, *Venezuela Refuses to Default. Few People Seem to Understand Why*, BLOOMBERG (July 5, 2016), Ex. 49. *See also* Quote from Jan Dehn (ASH_00006371), Ex. 1; ████████████████████████████████████████████████████████████████ All citations to exhibits (Ex. _) in this Memorandum are exhibits to the Declaration of James R. Bliss in Support of Motion Plaintiffs' Motion for Summary Judgment.

In September 2016, the faltering Maduro regime initiated the Exchange Offer[3] in a desperate attempt to conserve cash and stave off a politically disastrous PDVSA default.  Having failed to negotiate a forbearance with the holders of PDVSA's unsecured 2017 Notes, the Maduro regime's PDVSA leadership (including Maduro's oil minister, who simultaneously served as PDVSA's president) offered to exchange the 2017 Notes for an even larger amount of new, 2020 Notes secured by a purported pledge of a controlling interest in CITGO.

 As soon as the Exchange Offer was announced, the National Assembly passed a resolution "categorically rejecting" the offered pledge, initiating an investigation into PDVSA and the Exchange Offer, and invoking Article 187.9 of the Venezuelan Constitution, which provides that one of the National Assembly's core powers is to authorize (or, as in this case, refuse to authorize) contracts in the national public interest.  This crucial oversight power is based on Article 150 of the Venezuelan Constitution, which provides that "[n]o contract in the . . . **national public interest** shall be entered into . . . with companies not domiciled in Venezuela . . . **without the approval of the National Assembly**."  In a subsequent resolution passed after the 2020 Notes had been issued in violation of these constitutional provisions, the National Assembly declared the 2020 Notes Transaction invalid and void *ab initio* because PDVSA lacked the capacity to pledge CITGO as part of the Exchange Offer without the National Assembly's prior authorization.  Under the act of state doctrine, these resolutions, as well as the National Assembly's refusal to authorize the execution of the Transaction Documents, are official acts of state to which a U.S. court must defer.

Plaintiffs are also entitled to summary judgment independent of the act of state doctrine. The Transaction Documents for the 2020 Notes Transaction are "national public interest contracts" that were entered into illegally without prior National Assembly authorization as

---

[3]Capitalized terms in the preliminary statement are defined more fully below.

required by Articles 150 and 187.9 of the Venezuelan Constitution. They are therefore invalid, null and void *ab initio*, and entirely unenforceable, *as they never came into valid legal existence.* Plaintiffs' position is supported by the overwhelming weight of Venezuelan legal authority, including the National Assembly's own interpretation and assertion of its constitutional prerogative to authorize national public interest contracts; the legitimate Venezuelan Government's interpretation of its own laws as conveyed in its letter to this Court; decisions of the Venezuelan Supreme Tribunal recognizing that contracts entered into by state-owned enterprises such as PDSVA and PDVSA Petróleo were national public interest contracts; the opinions of Plaintiffs' Venezuelan law expert, Professor Allan R. Brewer-Carías, who proposed the inclusion of Article 150 in the Venezuelan Constitution and who is widely regarded as the world's foremost scholar of Venezuelan public law; and the views on national public interest contracts expressed by the overwhelming majority of other Venezuelan public law scholars.

From the beginning of this case, Defendants have attempted to hide behind the New York choice-of-law provisions in the Transaction Documents. But, as Your Honor recently observed, "there is a logical flaw inherent in following a contractual choice-of-law provision before determining whether the parties have actually formed the contract in which the choice-of-law clause appears."*Worthington v. JetSmarter, Inc.*, Civ. No. 18-12113 (KPF), 2019 WL 4933635, at *4 (S.D.N.Y. Oct. 7, 2019) (J. Failla). Defendants' primary argument regarding Venezuelan law is that the 2020 Notes Transaction did not require National Assembly approval because a "national public interest contract" must include the Venezuelan Republic itself as a party. Meanwhile, in another case involving a contract entered into by PDVSA (and not the Republic itself) with foreign/non-domiciled counterparties to establish a U.S.-based PDVSA litigation trust, Defendants' own counsel (Paul Weiss) has been correctly arguing the precise opposite—

that the "Trust Agreement" in question is "null and void" because it is a national public interest

contract entered into by PDVSA without constitutionally required National Assembly

authorization.  What is more, and also contrary to Defendants' position here, Defendants'

counsel has been correctly arguing that a National Assembly resolution declaring the Trust

Agreement to be a national public interest contract is "conclusive" as a matter of law.  Relying

on expert testimony directly contrary to the testimony of Defendants' expert in this case,

Defendants' counsel has argued that:

- "[C]ontracts with state-owned enterprises (like PDVSA) . . . may qualify as national public interest contracts."

- "The Trust Agreement is [] void because it was not approved by the National Assembly. Under Venezuelan law, public contracts that qualify as 'national interest contracts' must be approved by the National Assembly to be effective."

- "The National Assembly concluded in its resolution that the Trust Agreement is a national interest contract.  Under Venezuelan law, the National Assembly's resolution on this matter is ***conclusive*** . . . ."[4]

The District Court accepted this line of argument, which is essentially identical to *Plaintiffs'* line

of argument here.[5]

This Court should do the same and declare the entire 2020 Notes Transaction invalid and

unenforceable under the act of state doctrine and Venezuelan law.  Once the Court has decided,

as it must, that Plaintiffs are entitled to this declaration, Defendants' affirmative defenses and

counterclaims fall away.

## MATERIAL FACTS NOT SUBJECT TO GENUINE DISPUTE

## I.    PLAINTIFFS AND THEIR RECONSTITUTED BOARDS OF DIRECTORS

Formed in 1975 after the nationalization of the oil industry to coordinate, monitor, and

---

[4]*See* Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517 (S.D. Fla. July 23, 2018), at 26, Ex. 3.
[5]*PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*, 372 F. Supp. 3d 1353, 1362 (S.D. Fla. 2019).

control all Venezuelan oil and gas operations, Plaintiff PDVSA is a Caracas-based Venezuelan state-owned enterprise that is wholly owned by the Republic of Venezuela as mandated by Article 303 of the Venezuelan Constitution, which provides that "[f]or reasons of economic and political sovereignty and national strategy, the State shall retain all shares of [PDVSA] . . . ."[6] Plaintiff PDVSA Petróleo, also a Venezuelan state-owned enterprise based in Caracas, is a wholly-owned PDVSA subsidiary and the entity responsible for oil production and exploration.[7]

Plaintiff PDV Holding, a Houston-based Delaware corporation and wholly-owned PDVSA subsidiary,[8] is a holding company that owns 100% of the shares of CITGO Holding, Inc. ("CITGO Holding"), which, in turn, owns 100% of the shares of CITGO Petroleum Company ("CITGO"), a major, U.S.-based oil refiner.[9] Thus, PDVSA indirectly owns 100% of CITGO through PDV Holding and CITGO Holding.[10]

On February 8, 2019, pursuant to the "Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela" (the "Transition Statute") enacted by the National Assembly,[11] Interim President Juan Guaidó appointed a new, *ad-hoc* board of directors of PDVSA (the "Ad-Hoc Board") "for the purpose of carrying out all necessary actions to appoint a Board of Directors" for PDV Holding.[12] The Ad-Hoc Board is the only legitimate board of directors of PDVSA.[13] In accordance with the Transition Statute, the PDVSA Ad-Hoc Board appointed new boards of PDV Holding, PDVSA Petróleo, and PDVSA's

---

[6] 1999 VENEZUELAN CONSTITUTION art. 303, Ex.4; Offering Circular at 3, Ex. 5.
[7] Offering Circular at 85, Ex. 5.
[8] *Id*. at A-33.
[9] *Id*. at 87.
[10] *Id*. at 84.
[11] Asamblea Nacional, *Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela*, (Feb. 5, 2019) (translated), Ex. 6.
[12] *Jimenez v. Palacios*, No. 2019-0490-KSJM, 2019 WL 3526479, at *6 (Del. Ch. Aug. 2, 2019) (quoting Decree of Juan Guaidó (Feb. 5, 2019)).
[13] *See Jimenez*, 2019 WL 3526479, at *13 (holding that the Guaidó Government's reconstitution of PDVSA's board was an official act of state that must be accepted by U.S. courts without further inquiry); *Impact Fluid Solutions et al v. Bariven S.A. et al*, Civ No. 4:19-cv-00654, Dkt. No. 55 (S.D. Tex. May 20, 2020) (same), Ex. 29.

other wholly-owned subsidiaries.[14]

## II.    DEFENDANTS AND THE BENEFICIAL HOLDERS OF THE 2020 NOTES

Defendant Union Bank, a U.S. national banking association with its main office in

California and an office in New York City, is the Trustee under the Indenture and the Pledge.[15]

Defendant GLAS Americas is a New York limited liability company with a single English

member based in London.[16]  GLAS Americas is the Collateral Agent under the Indenture and the

Pledge Agreement.[17]  Defendants were never domiciled in Venezuela.[18]  As Trustee, Union Bank

represents the interests of the beneficial holders of the 2020 Notes, which are mostly hedge funds

managed by some of the largest and most sophisticated asset managers in the world.[19]

## III.    THE EXCHANGE OFFER AND THE 2020 NOTES TRANSACTION

In a September 2016 exchange offer (the "Exchange Offer"), PDVSA offered to

exchange its outstanding unsecured notes due in April and November 2017 (respectively, the

"April 2017 Notes" and the "November 2017 Notes" and, collectively, the "2017 Notes") for

new notes due in 2020 (the "2020 Notes").[20]  Like the 2017 Notes, the 2020 Notes were to be

issued with a purported guaranty from PDVSA Petróleo.[21]  However, unlike the 2017 Notes or

---

[14]*See* Decree of Juan Guaidó (Apr. 10, 2019), Ex. 7.

[15]*Defendants' Answers and Counterclaims*, Case No. 1:19-cv-10023-KPF, Dkt. No. 40, at ¶ 13 (S.D.N.Y. Dec. 18, 2019).

[16]*Id*. at ¶ 114.

[17]*Id*.

[18]*See id*. ¶¶ 77 & 114; *Complaint for Declaratory and Injunctive Relief*, Case No. 1:19-cv-10023-KPF, Dkt. No. 1, at ¶ 77.

[19]More than 50% of the 2020 Notes are beneficially held by hedge funds managed by Ashmore, a London-based asset manager with more than $98.4 billion under management as of December 31, 2019.  *See Third Quarter Assets Under Management Statement*, Ashmore Group, plc (Apr. 16, 2020), *available at* http://www.ashmoregroup.com/sites/default/files/reports/Ashmore%20Q3%20AuM%20statement%202019-20%20FINAL.pdf.  A substantial percentage of the remaining 2020 Notes are beneficially held by hedge funds managed by Blackrock, a New York-based asset manager with more than $7.4 trillion under management as of December 31, 2019, and hedge funds managed by Contrarian, a Greenwich, Connecticut-based asset manager with more than $6 billion under management as of December 31, 2019.  *See Form ADV*, Contrarian Capital Management, Ex. 8; *Annual Report 2019*, Blackrock, *available at*, https://s24.q4cdn.com/856567660/files/doc_financials/2019/ar/BlackRock-2019-Annual-Report.pdf.

[20]Offering Circular at cover page, Ex. 5.

[21]*Id*. at cover page & p. 14.

6

any other notes or debt previously issued or incurred by PDVSA, the 2020 Notes were also to be purportedly secured by a pledge of 50.1% of PDV Holding's shares of CITGO Holding (the "CITGO Shares") due to PDVSA's financial distress stemming from mismanagement and the collapse of its oil production.[22]

The Exchange Offer was accepted by the holders of approximately U.S. $2,799,000,000 of 2017 Notes, which was just 52.57% of the maximum tender amount and just 39.43% of the aggregate principal amount outstanding.[23]  For each U.S. $1,000 in outstanding principal amount of 2017 Notes tendered, PDVSA delivered between U.S. $1,120 and U.S. $1,170 of 2020 Notes depending on the due date of the tendered notes and the timing of the tender.[24] In aggregate, PDVSA issued approximately U.S. $3,367,529,000 in principal amount of 2020 Notes.[25] PDVSA received no additional funds from noteholders as part of the exchange.

The 2020 Notes were issued pursuant to an indenture dated as of October 28, 2016 (the "Indenture") and, as contemplated by the Indenture, purportedly secured by a pledge of 50.1% of PDV Holding's CITGO Holding shares pursuant to a pledge and security agreement (the "Pledge") also dated as of October 28, 2016.[26]  The 2020 Notes, the Indenture, and the Pledge comprise a set of interrelated contracts (as defined in the Indenture, the "Transaction Documents") relating to a single, integrated transaction (the "2020 Notes Transaction").[27]

The Indenture was entered into among (i) PDVSA, as Issuer, (ii) PDVSA Petróleo, as Guarantor, (iii) Union Bank, as Trustee, (iv) GLAS Americas, as Collateral Agent, (v) Law

---

[22]*Id*. at cover page & pp. 7 & 14.
[23]*PDVSA Announces Expiration and Final Results for its Offers to Exchange its Outstanding 5.250% Senior Notes due 2017 and 8.50% Senior Notes due 2017 for New 8.50% Senior Secured Notes due 2020*, PR NEWSWIRE (Oct. 24, 2016), *available at* https://www.prnewswire.com/news-releases/pdvsa-announces-expiration-and-final-results-for-its-offers-to-exchange-its-outstanding-5250-senior-notes-due-2017-and-850-senior-notes-due-2017-for-new-850-senior-secured-notes-due-2020-300349775.html.
[24]Offering Circular Supplement at 2, Ex. 9.
[25]Indenture at cover page, Ex. 10.
[26]*Id*. at 4; Pledge and Security Agreement, at 3-4, Ex. 11.
[27]Indenture at 18, Ex. 10.

7

Debenture Trust Company of New York, as Registrar, Transfer Agent, and Principal Paying

Agent, and (vi) Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Paying

Agent.[28]  The Pledge was entered into among (i) PDV Holding, as Pledgor, (ii) PDVSA, as

Issuer, (iii) PDVSA Petróleo, as Guarantor, (iv) GLAS Americas, as Collateral Agent, and (v)

Union Bank, as Trustee.[29]

The stated purpose of the Exchange Offer was to refinance the 2017 Notes because

"external factors" had affected the price at which PDVSA could sell its products, making it

"prudent to rearrange [PDVSA's] debt profile."[30]  However, the Exchange Offer did not alleviate

the causes of PDVSA's cash flow crisis and overall financial distress.  Instead of pursuing a

comprehensive restructuring of PDVSA's debt, the Maduro regime chose to refinance just the

2017 Notes, increasing PDVSA's debt burden and placing CITGO at risk.  Just one year after the

Exchange Offer, PDVSA defaulted on all of its debt except the 2020 Notes.

## IV.  THE ECONOMIC OUTCOME OF THE EXCHANGE OFFER FOR PDVSA AND EXCHANGING NOTEHOLDERS

Rather than having to accept a principal reduction (a face value "haircut"), noteholders

who accepted the Exchange Offer received more in 2020 Notes than remained due on their 2017

Notes (a face value "premium").[31]  The exchanging holders of April 2017 Notes also received a

3.25% higher interest rate.  Meanwhile, PDVSA obtained a (weighted average) maturity

extension of only 1.67 years for its obligations on the 2017 Notes.  Thus, the Exchange Offer

allowed PDVSA to avoid paying U.S. $2.982 billion in interest and principal through November

2017 on 2017 Notes but committed PDVSA to paying 40% *more* (U.S. $4.163 billion) in interest

---

[28]*Id*. at cover page & 18.
[29]Pledge at cover page & 18, Ex. 11.
[30]Offering Circular, at 7, Ex. 5.
[31]All facts in this section are from paragraphs 74-95 and Exhibits 4A and 4B of the Expert Report of David C. Hinman, dated March 16, 2020 (the "Hinman Report"), attached as Exhibit A to the Declaration of David C. Hinman in Support of Plaintiffs' Motion for Summary Judgment.

and principal on the 2020 Notes through October 2020. As one analyst report described the economics from PDVSA's perspective: "The swap in and of itself does nothing to improve PDVSA's creditworthiness. If anything, it worsens it . . . The swap provides some cash flow relief . . . But this cash flow relief is at the expense of a buildup of a new amortization hump not that far into the future."[32] While doing nothing to solve PDVSA's financial problems, the Exchange Offer created a new problem by placing CITGO at risk.

Regardless of when a noteholder purchased 2017 Notes exchanged for 2020 Notes, the total interest and principal payments received plus the current market value of the 2020 Notes exceeds the 2017 Notes' purchase cost. Counting only interest and principal payments, the value received for 2017 Notes purchased at issuance equals 153% and 192% of the purchase cost of the April 2017 Notes and the November 2017 Notes, respectively. For 2017 Notes purchased during the Exchange Offer window, the value received equals no less than 96% of the purchase cost.[33]

## V.  VENEZUELA'S CONSTITUTIONAL REQUIREMENT OF PRIOR NATIONAL ASSEMBLY AUTHORIZATION FOR NATIONAL PUBLIC INTEREST CONTRACTS WITH FOREIGN/NON-DOMICILED COUNTERPARTIES

The Venezuelan Constitution is the supreme law of Venezuela.[34] The Constitution was drafted by an elected Constituent Assembly that included Plaintiffs' Venezuelan law expert, Professor Allan R. Brewer-Carías.[35] Several articles of the Constitution impose requirements for "public interest contracts." As discussed more fully below, Article 150, which Professor Brewer proposed in his role as a constitutional drafter, provides that "*[n]o contract in the . . . national public interest shall be entered into with . . . companies not domiciled in Venezuela . . . without*

---

[32]Email from Javier Kulesz to Jan Dehn, "Jefferies LatAm Sovns – PDVSA's swap and Argentina's Euro bond deal," dated October 5, 2016. (ASH_00004270 – 274 at 271), Ex. 12.
[33]Hinman Report, at ¶¶ 92-96, Figure 1B.
[34]Expert Report of Allan R. Brewer-Carías dated March 16, 2020 (the "Brewer Report"), at ¶ 12, attached as Exhibit A to the Declaration of Allan R. Brewer-Carías in Support of Plaintiffs' Motion for Summary Judgment.
[35]*Id*. at ¶¶ 12-13.

*the approval of the National Assembly.*"[36]  Authorization of public interest contracts is

enumerated in Article 187.9 as one of the National Assembly's key oversight functions.[37]

## VI. THE NATIONAL ASSEMBLY'S PUBLIC OPPOSITION TO THE EXCHANGE OFFER AND EXPLICIT REJECTION OF THE PLEDGE

On May 26, 2016 (before the announcement of the Exchange Offer), the National

Assembly passed a resolution (the "May 2016 Resolution")[38] reciting, *inter alia*, that:

> In relation to contracts of national, state or municipal public interest concluded by
> and between the National Executive and . . . companies not domiciled in
> Venezuela, the Constitution categorically mandates, without exception, the
> approval of the National Assembly (art 150) . . . .

Following this and other recitals, the National Assembly resolved, *inter alia*:

> To warn that any activity carried out by an organ that usurps the constitutional
> functions of another public authority is null and void and shall be considered non-
> existent . . . [and]

> To remind that the contracts of national, state or municipal public interest
> concluded by and between the National Executive and . . . companies not
> domiciled in Venezuela, without the approval of the National Assembly; as well
> as other contracts of national public interest that it signs without this approval
> outside of the cases excepted by law, shall be null and void in their entirety.

On September 27, 2016, before the Transaction Documents were executed, the National

Assembly passed a resolution specifically regarding the 2020 Notes Transaction (the "September

2016 Resolution")[39] reciting, *inter alia*:

> That Article 187 of the Constitution empowers the National Assembly to exercise
> control functions over the National Government and the Public Administration,
> with the power to obtain information about the financial statements and details of
> any transaction that commits PDVSA's assets as collateral.

Following this and other recitals, the National Assembly resolved, *inter alia*:

---

[36] 1999 VENEZUELAN CONSTITUTION art. 150, Ex. 4.
[37] 1999 VENEZUELAN CONSTITUTION art. 187, Ex. 4.
[38] *Resolution on the Respect of the Inherent and Nontransferable Powers of the National Assembly on Contracts of Public Interest Signed by and between the National Executive and Foreign States or Official Entities or with Companies Not Domiciled in Venezuela*, dated May 26, 2016 (translated), Ex. 13.
[39] *Resolutions on the Current Financial Situation of Petróleos de Venezuela S.A.*, dated September 27, 2016 (translated), Ex. C to Complaint (emphasis added).

To summon citizen Eulogio del Pino, President of Petróleos de Venezuela SA, to appear before this National Assembly to explain the terms of this bond swap transaction, based on offering the majority of Citgo Holding Inc. shares as collateral . . .

**To reject categorically that, within the swap transaction, 50.1% of the shares comprising the capital stock of CITGO Holding, Inc. are offered as a guarantee with priority, or that a guarantee is constituted over any other property of the Nation . . . [and]**

To urge the Public Ministry to open an investigation to determine if the current transaction protects the National Property, in accordance with article[] 187, section 9. . . of the Constitution . . . .

During the National Assembly debate preceding the September 2016 Resolution, representative Guevara, President of the Comptroller's Commission, stated with respect to the Exchange Offer that "we will not acknowledge any national interest contract that does not come before this National Assembly; let me make this very clear to our international creditors: you know that this Party [of Maduro] is on its way out and that the people will enter Miraflores [presidential palace] very soon and you will not be able to ask us to honor the commitments of the irresponsible individuals who destroyed PDVSA."[40]  In the same National Assembly session, representative Guerra stated that "*[h]ere for the first time collateral is being put up, in the issuance of a PDVSA corporate bond, 50.1% of the shares of Citgo, that is questioned by the Venezuelan legal order*."[41]  On October 28, 2016, after the illegitimate, Maduro-controlled Supreme Tribunal quashed the National Assembly's investigation into PDVSA and the Exchange Offer, the 2020 Notes Transaction was completed despite the National Assembly's strenuous opposition and "categorical rejection" of the offered pledge.

Three years later, on October 15, 2019, after an investigation made possible by the formal recognition earlier in 2019 of the National Assembly and Interim President Guaidó as the only

---

[40]Asamblea Nacional, *Regular Session of Tuesday, September 27, 2016. Discussions on the effects of PDVSA Bond Redemption* (translated), Ex. 14, at 22.
[41]*Id*. at 5.

legitimate Venezuelan Government, the National Assembly passed a resolution (the "October 2019 Resolution")[42] reciting, *inter alia*:

> That PDVSA decided to ignore the [September 2016 Resolution] of this National Assembly, and proceeded with the bond swap transaction, despite the market not reacting favorably, due to the economic collapse of PDVSA and the public complaints presented by this Assembly in its [September 2016 Resolution] . . .
>
> That the swap increased PDVSA's obligations during 2016-2020 by US$1,102 million . . . Consequently, the total financing of the bond swap has an internal rate of return of almost 19.8% in dollars, plus the 50.1% of the Citgo Holding, Inc. shares offered as collateral . . .
>
> That the day following the announcement of the bond swap results, the Constitutional Court issued its ruling No. 893, in which it illegitimately prevented this National Assembly from investigating PDVSA . . . even though the nullity of the Resolution dated September 27, 2016 was not declared . . . [and]
>
> That following the investigations conducted in coordination with the Office of the Special Prosecutor, ***it was concluded that the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution*** . . .

Following these and other recitals, the National Assembly resolved, *inter alia*:

> To ratify that ***the 2020 Bond indenture violated Article 150 of the Constitution of the Bolivarian Republic of Venezuela, since it concerned a national interest public contract, executed with foreign companies, which was not authorized by the National Assembly*** . . . .

The foregoing National Assembly resolutions were each made public upon their passage and remain in full force and effect.[43]

Thus, the National Assembly opposed the Exchange Offer and declared the 2020 Notes Transaction invalid because, for the first time in any PDVSA debt transaction, a controlling interest in CITGO, an asset of national public interest, was purportedly pledged as collateral.

---

[42] *Resolutions that Reiterates the Invalidity of PDVSA's 2020 Bonds* (translated), Ex. D to Complaint (emphasis added).

[43] *See* May 2016 Resolution (ordering publication), Ex. 13; September 2016 Resolution, (same), Exhibit C to the Complaint; and October 2019 Resolution (same), Exhibit D to the Complaint.

## VII. MEDIA REPORTING AND ANALYST COMMENTARY REGARDING THE NATIONAL ASSEMBLY'S OPPOSITION TO THE EXCHANGE OFFER AND ASSOCIATED INVALIDITY RISK

The National Assembly's public opposition to the Exchange Offer and the associated invalidity risk was the subject of contemporaneous media reporting and market analyst commentary. No fewer than fourteen media and market research sources called attention to the invalidity risk during the Exchange Offer period, many pointing to the National Assembly's September 2016 Resolution. For example:

- On September 14, 2016, the day after the Exchange Offer was announced, a Wall Street Journal article noted that "***Venezuela's constitution requires the National Assembly to approve any new indebtedness of the republic***;"[44]

- On September 17, 2016, an article in *El Nacional*, a leading Venezuelan news outlet, quoted a Venezuelan constitutional lawyer as saying that ***the decree purportedly allowing PDVSA to use CITGO as collateral was unconstitutional*** and that "***any contract [PDVSA] signs is invalid***;"[45]

- On September 18, 2016, a Nomura analyst stated in an email to market participants that "[t]he make or break of the exchange is the assessment of the equity valuation and the ***legal risks***" and that "opinions from local lawyers suggest[ed] that ***all [such] international transactions . . . would require legislative approval or otherwise risk illegality . . .***;"[46]

- On September 19, 2016, UBS published an analyst report ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[47]

- On September 28, 2016, the day after the National Assembly adopted the September 2016 Resolution, a Venezuelan media outlet published a press release entitled "*Freddy*

[44] Carolyn Cui, *Venezuela's PdVSA to Offer to Swap $7 Billion in Debt*, WALL ST. J. (Sept. 14, 2016) (emphasis added), *available at* https://www.wsj.com/articles/venezuelas-pdvsa-to-offer-to-swap-7-billion-in-debt-1473878226.
[45] *Debt Issue Under New Decree Will be Void*, EL NACIONAL (VENEZUELA) (Sept. 27, 2016) (translated) (emphasis added), Ex. 15.
[46] Email from Siobhan Morden to Patrick Haller, Michel Aubenas, Pablo Goldberg and 27 others, "Venezuela | PdVSA exchange," *Nomura*, September 18, 2016. (ASH_00000743 – 746 at 743) (emphasis added), Ex. 16; Email from Dan Gelfand to Michel Aubenas, Pablo Goldberg and 27 others, "FW: Venezuela | PdVSA exchange," dated September 18, 2016, forwarding an email from Siobhan Morden, "Venezuela | PdVSA exchange," *Nomura*, dated September 18, 2016. (BLA_00000556 – 558 at 557) (emphasis added), Ex. 17.
[47] Alejo Czerwonko, "Venezuela bonds: Of politics and swaps," *UBS*, September 19, 2016, p. 3. (UBS-PDV000001 – 009 at 003) (emphasis added), Ex. 18.

*Guevara: Government has proven negligent and destructive of the economy*," which quoted representative Guevara as saying with respect to the Exchange Offer that the National Assembly "***will not recognize any public contract that is not considered or authorized by the Legislative Branch in accordance with the Constitution***;"[48]

- On October 11, 2016, a research report from Torino Capital—an analyst firm that advised Ashmore in connection with the Exchange Offer—noted that the tender deadline had been extended twice because of "concern[s] about the ***legal risks associated with the new bond***" and that noteholders "may expect that the market will not only discount the collateral on the 2020 but perhaps also force it to trade at an additional discount given ***concerns about the legality of the issuance***;"[49] and

- On October 13, 2016, Goldman Sachs and J.P. Morgan published research reports noting, respectively, that "***the National Assembly has questioned the legitimacy of offering a 50% participation of CITGO as collateral***[50] and that "***the deal could be 'illegal' and reneged upon by a future opposition government***."[51]

These and numerous other sources questioning the validity of the 2020 Notes Transaction are compiled in Plaintiffs' Rule 56.1 Statement and discussed in the accompanying initial expert report of David C. Hinman, an expert in sovereign and quasi-sovereign debt investing (as defined above, the Hinman Report).

## VIII. THE SUBJUGATION OF THE NATIONAL ASSEMBLY AND THE SUPREME TRIBUNAL BY THE CHÁVEZ AND MADURO REGIMES

The Maduro regime's disregard of the National Assembly's public opposition to the Exchange Offer was emblematic of a longstanding disregard of the separation of powers

---

[48] Lysaura Fuentes, *Freddy Guevara: Government has proven negligent and destructive of the economy*, *El Cooperante* (Sept. 28, 2016) (emphasis added) (translated), Ex. 19. An article from the same outlet the day before quoted Mr. Guevara as saying "[w]e will not pay for the broken crockery of a small group of crooks that destroyed Venezuela. *Not only do we not recognize these transactions, we will also investigate everyone involved in the sale because it would be implying an embezzlement of the Nation. Freddy Guevara on PDVSA: We will not recognize any bond swap that has not been authorized by the NA*, LA PATILLA (Sept. 27, 2016) (translated) (emphasis added), Ex. 20.

[49] Francisco Rodríguez, "Venezuela this Week: October 11-16, 2016 Of Laws and Bonds," *Torino Capital LLC*, (ASH_00006934 – 941 at 939 – 940) (emphasis added), Ex. 21.

[50] Email from GS Macro Economics Research to Jan Dehn, Herbert Saller, Xin Xu, and Pablo Goldberg, "LATAM Today: October 13, 2016," dated October 13, 2016. (ASH_00000275 – 280, Ex. 22; ASH_00001588 – 593, Ex. 23; ASH_00002573 – 578, Ex. 24; BLA_00001162 – 167, Ex. 25) (emphasis added).

[51] Email from Dan Gelfand to Blackrock employees, "FW: PDVSA : Swap extended again and the clock is ticking," dated October 13, 2016 forwarding email from Javier Zorrilla, Ben Ramsey, and Trang Nguyen, "PDVSA Swap Extended Again and the Clock is Ticking," *J.P. Morgan*, October 13, 2016. (BLA_00001171 – 175 at 172). (emphasis added), Ex. 26.

embodied in the Venezuelan Constitution.[52]  Since the beginning of the Chávez regime in 1999,

the National Executive branch of the Venezuelan Government has devoted itself to neutralizing

the National Assembly and subduing the judiciary.  The primary means of neutralizing the

National Assembly has been simply to ignore its constitutional powers.  Thus, in flagrant

violation of the Venezuelan Constitution, the National Executive has entered into numerous

national public interest contracts[53] without National Assembly authorization.[54]

It was not until the opposition parties won control in the December 2015 parliamentary

elections that the National Assembly could begin asserting its constitutional powers as an

independent branch of government, overseeing the government and the Public Administration.

Since that time, the National Assembly has passed numerous resolutions declaring contracts to

be national public interest contracts or rejecting contracts entered into without legislative

authorization, including PDVSA contracts unrelated to the 2020 Notes Transaction.

---

[52]All facts in this section are from paragraphs 54-65 of the Brewer Report.

[53]The Brewer Report (pp. 21-23) cites numerous examples of high-profile national public interest contracts entered into with foreign/non-domiciled counterparties that were required to be submitted to the National Assembly for authorization under Article 150 of the Constitution but were not, including: a 2007 contract for technological services relating to the transformation and modernization of Venezuelan citizen identification and passport services entered into by the Republic and a Venezuelan state foundation with a unit of the Republic of Cuba and a Cuban corporation; the Framework Contract of the National Geological Prospection of Venezuela, entered into in 2012 by the Republic and the Venezuelan Geology and Mining Institute with a Chinese corporation; and various contracts of national public interest entered into by a number of Venezuelan state-owned entities with a Chinese engineering company.

[54]Other means have included the appropriation of the National Assembly's legislative functions through executive decrees and the direct persecution of opposition party members, many of whom have been jailed or forced into exile. In 2001, Chávez approved his first forty-eight executive decrees, proclaiming "La Ley soy yo . . . El Estado soy yo" ("The law is me . . . The state is me").  Allan R. Brewer-Carías, *The Principle of Separation of Powers and Authoritarian Government in Venezuela, in* 47 DUQ. L. REV. 837-38 (2009).  Chávez approved another forty decrees in 2008, threatening to persecute anyone opposing him and similarly proclaiming "Yo soy la Ley . . . Yo soy el Estado" ("I am the Law . . . I am the State").  *Id.*  As one of Venezuela's most important journalists described the situation in 2008: "[F]rom a conceptual point of view, the Venezuelan political system is autocratic.  All political power is concentrated in the hands of the President.  There is no real separation of Powers."  Brewer Report at ¶ 60 (citing Teodoro Petkoff, *Election and Political Power. Challenges for the Opposition, in* REVISTA: HARVARD REVIEW OF LATIN AMERICA 2 (2008), Ex. 27.  In 2009, the President of the Supreme Tribunal, which was by then completely dominated by Chávez, exclaimed in a press conference that "the separation of powers weakens the State" and that this system "has to be reformed."  Brewer Report at ¶ 59 (citing Juan Francisco Alonso, *La división de poderes debilita al estado. La presidenta del TSJ [Luisa Estela Morales] afirma que la Constitución hay que reformarla* [*The division of power weakens state, President of TSJ [Luisa Estela Morales] states that the Constitution must be reformed*], El Universal (Dec. 5, 2009), Ex. 28.

Yet, following the December 2015 parliamentary elections, the illegitimate Supreme Tribunal issued more than a hundred decisions that transformed Venezuela's government into what has been called a "judicial dictatorship" or "judicial tyranny."[55]  In one such decision, the Supreme Tribunal eliminated the parliamentary immunity of National Assembly members, arrogated to itself all of the legislative powers of the National Assembly, and delegated legislative powers to Maduro, permitting him to reform laws and codes at his discretion.[56]  In 2016, the Secretary General of the Organization of American States reported on "the co-opting of the Judicial branch by the Executive Branch" and called for "a new composition of the Supreme Tribunal of Justice . . . given that the current composition is completely flawed, both in the appointment process as well as in the political bias of virtually all its members."[57]

Thus, in the 2019 Transition Statute, the National Assembly called for legislation prohibiting public officials from "obey[ing] orders from the one who usurps the Presidency of the Republic [Maduro]" or from "the other unconstitutionally integrated organs such as the Supreme Tribunal of Justice," declaring illegitimate all justices appointed before July 21, 2017.[58] The U.S. Government has also declared the Supreme Tribunal illegitimate, recognizing that it "usurped the authority of Venezuela's democratically-elected legislature, the National Assembly, including by allowing the Executive Branch to rule through emergency decree, thereby restricting the rights and thwarting the will of the Venezuelan people."[59]  Going even further, the

---

[55]Brewer Report at ¶ 87 (quoting Allan R. Brewer-Carías, Emeritus Professor, Central University of Venezuela, *Transition from Democracy to Tyranny through the Fraudulent Use of Democratic Institutions: The Case of Venezuela* (Sept. 25, 2018)), *available at* https://allanbrewercarias.com/wp-content/uploads/2018/09/1218.-Brewer.-conf.-Transictiion-Democracy-to-Tyranny.-B.C.-2018.pdf.
[56]*Id.*
[57]Org. of Am. States, *Luis Almagro to Mr. Juan Jose Arcuri*, at 65, 109, OSG/243-16 (May 26, 2016), at 111 & 112, *available at* http://www.oas.org/documents/eng/press/OSG-243.en.pdf.
[58]Asamblea Nacional,*Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela* (Feb. 5, 2019) (translated), Ex. 6.
[59]*See Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice*, U.S. DEP'T OF THE TREASURY (May 18, 2017), *available at* https://www.treasury.gov/press-center/pressreleases/Pages/sm0090.aspx.

U.S. Government has sanctioned the President of the Supreme Tribunal and seven principal members of the Constitutional Chamber for preventing "the democratically-elected National Assembly [from] perform[ing] its constitutional functions."[60]More recently, the U.S. Government has placed visa restrictions on "members of the illegitimate Supreme Court[] for undermining Venezuela's democracy" and indicted the Supreme Tribunal's President for alleged crimes, including accepting bribes to fix civil and criminal cases.[61]

## IX. THE U.S. GOVERNMENT'S RECOGNITION OF THE NATIONAL ASSEMBLY AND INTERIM PRESIDENT GUAIDÓ

Following a rigged presidential election in 2018, the National Assembly invoked Article 233 of the Venezuelan Constitution to declare Maduro's presidency illegitimate and name National Assembly President Juan Guaidó as the Interim President of Venezuela.[62] On January 23, 2019, the U.S. President branded the Maduro regime "illegitimate," acknowledged the National Assembly as the "only legitimate branch of government duly elected by the Venezuelan people," and officially recognized "the President of the Venezuelan National Assembly, Juan Guaidó, as the Interim President of Venezuela."[63]The U.S. Government has continually affirmed its official recognition of and support for Interim President Guaidó and the National Assembly through executive orders, licenses, guidance, acceptance of diplomats, and public statements.[64]

---

[60]*Id.*
[61]U.S. Department of State, *U.S. Sanctions on Venezuelan Individuals and Entities* (Press Statement, Feb. 15, 2019), *available at* https://www.state.gov/u-s-sanctions-on-venezuelan-individuals-and-entities/; *U.S. v. Maikel Jose Moreno Perez*, Case No. 1:20-mj-02407-JJO (S.D. Fl. Mar. 12, 2020).
[62]Doug Stanglin, *U.S. recognizes Venezuela opposition leader Juan Guaidó as president; Russia backs Maduro*, USA TODAY (Jan. 23, 2019).
[63]Press Statement, Secretary of State Michael R. Pompeo, Recognition Of Juan Guaidó As Venezuela's Interim President By Several European Countries (Feb. 4, 2019), *available at* https://eg.usembassy.gov/secretary-pompeo-on-recognition-of-juan-Guaidó-as-venezuelas-interim-president-by-several-european-countries/.
[64]For example, the U.S. President has issued numerous executive orders imposing strict sanctions in light of Maduro's "usurpation of power" and the "illegitimate Maduro regime['s]" efforts to "prevent the Interim President and the National Assembly from exercising legitimate authority in Venezuela." *See* Executive Orders 13857 (January 25, 2019) and 13884 (August 5, 2019). The U.S. Treasury Department has likewise issued orders blocking transactions with the Maduro regime and permitting transactions with the National Assembly and Interim President Guaidó. *See* OFAC General Licenses 7 & 31. The U.S. State Department has issued statements reiterating that "the

Even before formal recognition, the U.S. had declared the National Assembly to be Venezuela's "only legitimate legislative body."[65]

## ARGUMENT

### I. THE NATIONAL ASSEMBLY'S OFFICIAL ACTIONS WITHHOLDING AUTHORIZATION OF THE TRANSACTION DOCUMENTS AND DECLARING THE 2020 NOTES TRANSACTION INVALID ARE ACTS OF STATE THAT CANNOT BE "OVERRULED" BY A U.S. COURT

Longstanding Supreme Court and Second Circuit precedent "precludes any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 743 (2d Cir. 2016) (quoting *First Nat. City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 763 (1972)). The act of state doctrine was recast in its modern form in *Banco Nacional de Cuba v. Sabbatino*, where the Supreme Court elucidated the doctrine's "constitutional underpinnings," noting that it "arises out of the basic relationships between branches of government in a system of separation of powers" and "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." 376 U.S. 398, 423 (1964).

Under the act of state doctrine, domestic acts of a legitimate foreign government "cannot be questioned but must be accepted by our courts as a rule for their decision."*Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) (quoting *Ricaud v. American Metal*

---

United States does not recognize the Maduro regime as the government of Venezuela" and considers Maduro the "former President." Press Statement, U.S. Dep't of State, *Continuing U.S. Diplomatic Presence in Venezuela* (Jan. 23, 2019), *available at* https://www.state.gov/continuing-u-s-diplomatic-presence-in-venezuela/.
[65] Press Statement, U.S. Department of State, *Assumption of Legislative Powers in Venezuela* (Aug. 18, 2017) ("[T]he democratically-elected National Assembly is the only legitimate legislative body . . . As long as the Maduro regime continues to conduct itself as an authoritarian dictatorship, we are prepared to bring the full weight of American economic and diplomatic power to bear in support of the Venezuelan people as they seek to restore their democracy."), *available at* https://www.state.gov/assumption-of-legislative-powers-in-venezuela/.

*Co.*, 246 U.S. 304, 309 (1918)); *see also W.S. Kirkpatrick & Co. v. Env'l Tectonics Corp*, 493 U.S. 400, 409 (1990) (the act of state doctrine is a "rule of decision" and "requires that, in the process of deciding [a case or controversy], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid."). Courts in the U.S. have already recognized that acts of the National Assembly with regard to the PDVSA Ad Hoc Board merit deference under the act of state doctrine as the actions of Venezuela's only legitimate government. *See Jimenez*, 2019 WL 3526479, at *11 ("The determinations of the Executive Branch are unambiguous: Guaidó is recognized, the National Assembly is legitimate, and neither Maduro nor the Constituent Assembly are legitimate parts of the Venezuelan government."); *Impact Fluid Solutions et al v. Bariven S.A. et al*, Civ No. 4:19-cv-00654, Dkt. No. 55, at 6 (S.D. Tex. May 20, 2020) ("Appl[ying the act of state doctrine] here, the Court will not question the validity of any laws promulgated by the Venezuelan National Assembly or any acts taken by Interim President Guaidó pursuant to those laws. In accord with other courts confronted by similar issues, this recognition extends to acts regarding the management of Venezuela's state-owned corporations."), Ex. 29.

The U.S. Government's official recognition in 2019 of Interim President Guaidó and the opposition-led National Assembly as Venezuela's only legitimate government (consistent with its prior recognition of the National Assembly as Venezuela's "only legitimate legislative body") is "*retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence*"—*i.e.*, after the opposition won control of the National Assembly in the December 6, 2015 parliamentary elections. *Konowaloff*, 702 F.3d at 146 (quoting *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302–03 (1918) (retroactively recognizing the seizure of hides by the revolutionary government in Mexico)) (emphasis in

original); *see also United States v. Belmont*, 301 U.S. 324 (1937) (retroactively recognizing actions by the Soviet Government); *United States v. Pink,* 315 U.S. 203 (1942) (same); *Underhill v. Hernandez*, 168 U.S. 250 (1897) (retroactively recognizing actions taken by the Palacio government in Venezuela before it seized power).

As conveyed in the legitimate Venezuelan Government's letter to this Court,[66] the Republic considers the National Assembly's above-referenced resolutions regarding the 2020 Notes Transaction and refusal to authorize the Transaction Documents to be official acts of state warranting deference from U.S. courts under the act of state doctrine.[67]  The Republic is absolutely right.  As further conveyed in that letter and discussed more fully below, the National Assembly's refusal to authorize the Transaction Documents and the adoption of its September 2016 Resolution condemning the Exchange Offer, "categorically rejecting" the proposed pledge of CITGO Shares, and initiating an investigation *before* the Indenture and the Pledge were executed prevented them from coming into valid legal existence and rendered them void *ab initio*.[68]  The National Assembly's October 2019 Resolution—unmistakably entitled "Resolution that Reiterates the Invalidity of PDVSA's 2020 Bonds"—confirmed the import of the National Assembly's September 2016 Resolution and refusal of authorization and explicitly declared the

---

[66]Letter to the Honorable Katherine Polk Failla, United States District Court Judge, from Carlos Vecchio, Ambassador of the Bolivarian Republic of Venezuela to the United States, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A., et. al.*, Case No: 19-cv-10023-KPF, Dkt. 80 (June 9, 2020).

[67]Courts have long recognized that a State's refusal to act can qualify as an "official act" for purposes of the act of state doctrine.  *See, e.g., Underhill*, 168 U.S. at 252 (holding that the act of state doctrine "must necessarily extend" to the retroactively recognized Venezuelan revolutionary forces' refusal to grant the plaintiff a passport).  Likewise, the passage of a "statute, decree, order, *or resolution*" qualifies as an "official act."  *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976)) (emphasis added).

[68]Such evidence from a foreign sovereign representative has been considered by the Supreme Court and the Second Circuit on numerous instances as proof that the "official act" in question occurred, had a specific effect, and was of a governmental character. *See, e.g., Alfred Dunhill*, 425 U.S. at 723 (statements from counsel representing Cuba were considered "authoritative representations of the position" of Cuba and thereby "serve to confirm that the continued retention of [the seized money] has been undertaken as an exercise of sovereign power."); *Banco de Espana v. Fed. Reserve Bank of New York*, 114 F.2d 438, 441 (2d Cir. 1940) (affidavit from ambassador of Spain alleging that the Spanish government had authority to acquisition a cache of silver through governmental decree and ministerial orders was accepted by court as proof of the fact that such acts had occurred).

invalidity of the 2020 Notes Transaction.

Likewise, in the *PDVSA U.S. Litigation Trust* case, Defendants' counsel (Paul Weiss) correctly argued that a National Assembly resolution passed prior to formal recognition and declaring invalid an unauthorized PDVSA contract of national public interest was an official act deserving deference under the act of state doctrine.[69] As Defendants' counsel rightly pointed out: "The Judiciary's rebuke of the only Venezuelan legislative body recognized by the Executive Branch would thus undermine the long-standing principle that '[r]ecognition is a topic on which the Nation must speak . . . with one voice.'" *Id*. (quoting *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2086 (2015)). The court agreed, explaining that "[t]he United States' recognition of the National Assembly, as opposed to the Maduro regime, is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence." *PDVSA U.S. Litigation. Trust*, 372 F. Supp. at 1362 (internal quotation marks omitted). Although the case was decided on other grounds, the court acknowledged that "if the National Assembly's [2018 resolution declaring] that the [Trust Agreement entered into by PDVSA] is unconstitutional is considered an official act of the government of Venezuela, the Act of State doctrine would preclude this Court from ruling otherwise." *Id*. (citing *Konowaloff*, 702 F.3d at 146). Less than two weeks ago, Paul Weiss filed a supplemental appeal brief asking the Eleventh Circuit to defer to a letter from the legitimate Venezuelan Government conveying the Republic's view that "[c]onsistent with its constitutional role under Article 187.9, the National Assembly had authority to identify the Litigation Trust Agreement as a national public interest agreement [requiring National Assembly

---

[69]Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr.*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517 (S.D. Fla. July 23, 2018), at 20-23, Ex. 3; *Resolution to Denounce the Unconstitutionality of the Constitution of the Trust 'PDVSA US Litigation Trust', by Sociedad Anonima Petroleos de Venezuela,* dated April 24, 2018 (translated), Ex. 69).

authorization].''[70]

Notably, this is not a case like *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985), where the Second Circuit held that the act of state doctrine did not apply to actions taken by the Costa Rican Government to suspend payments on indisputably valid New York debt already in existence at the time of the suspension. [71]  In other words, this is *not* a case of a government taking actions after the fact in an effort to avoid valid, preexisting obligations sited in the U.S.  The National Assembly's September 2016 Resolution and refusal of authorization before the Transaction Documents were executed were "able to come to complete fruition within the dominion of the [sovereign]," preventing the Transaction Documents from coming into valid legal existence, and therefore are "not subject to re-examination and modification by the courts of this country."  *Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 224 (2d Cir. 1985) (deferring to Mexico's official acts modifying certificates of deposit paid in U.S. dollars to U.S. Citizens in their New York bank accounts).  Accordingly, the act of state doctrine applies to the National Assembly's actions, which were undertaken within Venezuela to stop a transaction relating to the debt of Venezuela's state-owned oil company and its national oil industry activities in Venezuela, notwithstanding any "corollary effects" outside of Venezuelan territory (i.e., effects on the purportedly pledged CITGO Shares).[72]

---

[70]Letter to Mr. David J. Smith, Clerk of Court for United States Court of Appeals for the Eleventh Circuit, from Carlos Vecchio, Ambassador of Bolivarian Republic of Venezuela to the United States of America, dated, May 7, 2020, Ex. 30; Supplemental Brief of Appellees, *PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas LLC*, Case No. 19-10950 (11th Cir. May 29, 2020), at 7-8, Ex. 31.

[71]Even if this *were* such a case, the act of state doctrine would still apply because, unlike in *Allied Bank*, any extraterritorial "taking" of property would be "consistent with the law and policy of the United States"—*i.e.*, the U.S. foreign policy vis-à-vis Venezuela.  *See Allied Bank*, 757 F.2d at 522; *see also Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 57 (S.D.N.Y. 2015) (applying the act of state doctrine to give extraterritorial effect to Cuba's taking of assets in the U.S. because doing so would further U.S. policy).

[72]The act of state doctrine applies to the National Assembly's actions notwithstanding any "corollary effects" outside of its territory (*e.g.*, effects on PDVSA's assets abroad).  *See Republic of Panama v. Air Panama Int'l, S.A.*, 745 F. Supp. 669, 673 n.4 (S.D. Fla. 1988) (holding that board and management appointments were valid under the act of state doctrine where such appointments were made for the purpose of controlling assets in the U.S.); *Jimenez*, 2019 WL 3526479, at *1 and *20 (upholding the National Assembly's act resulting in the constitution of new boards

The act of state doctrine is designed to prevent courts, in deciding what weight to give certain acts of foreign states, from interfering with the Executive Branch's primacy in the conduct of foreign affairs.  *Oetjen*, 246 U.S. at 404.  This concern looms large in the present case given the illegitimate Maduro regime's continuing hold on power in Caracas and the U.S. political branches' strong support for the Guaidó Government's continuing efforts to restore Venezuelan democracy and address the country's ongoing economic and humanitarian crises. Indeed, with CITGO hanging in the balance, a decision that the 2020 Notes Transaction was "valid, notwithstanding the National Assembly's clear pronouncement to the contrary, risks undermining the Executive Branch's recognition of that body as the 'only legitimate legislature' in Venezuela."  Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr.*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517, at 21.  Plaintiffs are thus entitled to summary judgment under the act of state doctrine alone.

## II. THE TRANSACTION DOCUMENTS ARE INVALID, ILLEGAL, NULL AND VOID *AB INITIO*, AND UNENFORCEABLE UNDER APPLICABLE VENEZUELAN LAW

Plaintiffs are also entitled to summary judgment apart from the National Assembly's conclusive acts of state because, under applicable Venezuelan law, the Transaction Documents are invalid, illegal, null and void *ab initio*, and unenforceable under any standard on account of the purported pledge of CITGO Shares.

### A. Venezuelan Law Governs the Validity of the 2020 Notes Transaction

The 2020 Notes, the Indenture, and the Pledge are indispensable components of a single, integrated transaction entered into by PDVSA and PDVSA Petróleo, both state-owned enterprises of the Venezuelan Republic.  The pledged CITGO Shares were (and are) owned by

---

of directors for PDVSA's U.S. subsidiaries; "the knock-on effects of that act which took place outside of Venezuela do not render the original act extraterritorial").

PDV Holding, which had no independent reason to become a co-party to the Pledge alongside

PDVSA and PDVSA Petróleo and did so solely because its Venezuelan parent company (and

ultimately the Maduro regime, which controlled PDVSA at the time) offered up the CITGO

Shares as part of the Exchange Offer.  Ultimately, the purported pledge was driven by PDVSA's

financial crisis in Venezuela and had nothing to do with PDV Holding.

The Transaction Documents' New York choice-of-law provisions are irrelevant in

determining whether the 2020 Notes Transaction is valid in the first place.  As Your Honor has

explained, "there is a logical flaw inherent in following a contractual choice-of-law provision

before determining whether the parties have actually formed the contract in which the choice-of-

law clause appears." *Worthington*, 2019 WL 4933635, at *4 (J. Failla) (citing *Schnabel v.

Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)).

This logical flaw has long been recognized in the international debt context and in the

context of Latin American government issuers in particular:

> It is generally recognized that the capacity or authority of a corporate,
> governmental or other juridical entity to contract loans and issue bonds is
> governed by its personal law, i.e., by the law of the borrower itself.[73]
>
> [T]he insulation from the borrower's law achieved basically by choosing a foreign
> law (mostly New York or English law) is limited: The legal status and capacity of
> the borrower, including his contracting and borrowing limits can only be
> determined only[sic] by national law.  These are matters of "non-choice."[74]
>
> In civil law countries [such as Venezuela], government agencies must be
> explicitly empowered with regard to the content, scope, and sometimes procedure
> of agreements.  Often (particularly in Latin America), there are constraints and
> rules for government contracting in the constitution, investment and sectoral laws,
> in general public contract regulations, and in the laws and regulations applicable
> to particular government agencies (e.g., central banks and other monetary
> authorities).  Contracts concluded by government agencies without sufficient

---

[73]G. Delaume, LEGAL ASPECTS OF INTERNATIONAL LENDING AND ECONOMIC DEVELOPMENT FINANCING, 130
(1967), Ex. 32.

[74]Thomas Wälde, THE SANCTITY OF DEBT AND INSOLVENT COUNTRIES: DEFENSES OF DEBTORS IN INTERNATIONAL
LOAN AGREEMENTS, IN JUDICIAL ENFORCEMENT OF INTERNATIONAL DEBT OBLIGATIONS, David M. Sassoon and
Daniel D. Bradlow, eds., 125 (International Law Institute 1987) Ex. 33.

authority . . . are ultra vires and therefore void . . . [I]t is hard to argue for the
effectiveness of a contract concluded without sufficient authority or in
noncompliance of material procedural rules, where such defect was known or
could have been identified by the other contracting party applying due diligence.[75]

The logical proposition that the law governing the authority to issue debt is a matter of

"non-choice" is also embedded in New York law, which prohibits parties from choosing the law

of a jurisdiction other than the issuer's jurisdiction to govern the validity of notes or other

securities. Section 1-301 of the Uniform Commercial Code (as adopted in New York, the

"UCC"), entitled "Territorial Application of the Act; Parties' Power to Choose Applicable Law,"

provides in subsection "(c)" that "*[i]f one of the following provisions of [this Act] specifies the*

*applicable law, that provision governs and a contrary agreement is effective only to the extent*

*permitted by the law [including the conflict of laws rules] so specified* . . . ." One of the

"following provisions of this Act" listed in subsection "(c)" is "Section 8-110" of the UCC.

Section 8-110, which deals with investment securities such as the 2020 Notes, provides

that "*[t]he local law of the <u>issuer's jurisdiction</u> . . . governs . . . the validity of a security* [and

other specified issues]." UCC § 8-110(a)(1) (emphasis added). The "issuer's jurisdiction" is

defined as "the jurisdiction under which the issuer of the security is organized or, if permitted by

the law of that jurisdiction, the law of another jurisdiction specified by the issuer." UCC § 8-

110(d). An issuer is expressly permitted to choose the law of another jurisdiction to govern

issues *other than validity*. Thus, "[t]he issuer *cannot specify* that the law of another jurisdiction

should determine the validity of a security." 8 Anderson U.C.C. § 8-110:6 [Rev] (3d ed.)

(emphasis added). This is because "[t]he question whether an issuer can assert the defense of

---

[75] Thomas W. Wälde and George Ndi, STABILIZING INTERNATIONAL INVESTMENT COMMITMENTS: INTERNATIONAL LAW VERSUS CONTRACT INTERPRETATION, 31 Tex. Int'l L.J. 215 (Spring 1996).

invalidity may implicate significant policies of the issuer's jurisdiction of incorporation."[76]  As

explained in Professor Brewer's initial expert report, Venezuelan law does not permit the

specification of another jurisdiction's law to govern the validity of contracts such as the

Transaction Documents because such contracts implicate significant public policies of the

Venezuelan Republic.[77]

The requirement that Venezuelan law govern the validity of the 2020 Notes Transaction

is also reflected in the opinion letter provided to Credit Suisse, which acted as PDVSA's advisor,

covering PDVSA and PDVSA Petróleo's authorization to enter into the transaction, the need for

government approvals, and compliance with Venezuelan law.  That opinion letter, which covered

all of the Transaction Documents, was rendered exclusively under Venezuelan law by

Venezuelan counsel.[78]  By contrast, the opinion rendered by New York counsel with respect to

New York and federal law, which covered other matters, expressly "assumed" such

authorization, approvals, and legality under Venezuelan law.[79]  (As demonstrated below,

however, the opinion of Venezuelan counsel was entirely erroneous with respect to the validity

of the 2020 Notes Transaction under Venezuelan law).

In any event, there can be no "conflict of laws" with respect to the validity of the 2020

---

[76]UCC § 8-110, Official Comment 2.

[77]Brewer Report, at pp. 53-59.  The UCC's Article 8 choice-of-law rules are expressly carved out of section 5-1401 of the New York General Obligations Law, which provides that parties can choose New York law to govern large commercial transactions, including transactions subject to the UCC, even if the transaction bears no reasonable relation to the state.  N.Y. Gen. Oblig. § 5-1401(1) (providing that "[t]his section [5-1401] shall not apply to any contract, agreement or undertaking . . . to the extent provided to the contrary in subsection (c) of section 1-301 of the uniform commercial code.").  The New York governing law provisions in the Transaction Documents expressly incorporate section 5-1401 in its entirety and thus incorporate its carve-out for the choice-of-law rules in UCC Article 8.

[78]*See* Form of Opinion Letter from Despacho de Abogados Miembro de Hogan Lovells to Credit Suisse Securities (USA) LLC, as Financial Advisor, re: Petróleos de Venezuela, S.A. Offering, p. 4, annexed to Financial Advisors Agreement, Ex. 34.

[79]*See id*. at 2 ("For purposes of this opinion letter, we have assumed that (i) each party to the Transaction Documents (except to the extent set forth in Paragraph (l) as to the [PDV Holding as Pledgor]) has all requisite power and authority under all applicable laws, rules, regulations and governing documents to execute, deliver and perform its obligations under the Transaction Documents . . . .").

Notes Transaction for the simple reason that New York law can have nothing to say regarding

the authority of Venezuelan state-owned enterprises to enter into contracts of national public

interest without National Assembly authorization. This is, by nature, a question for which only

Venezuelan law, which has not changed since the time of the Exchange Offer, can supply the

rule of decision. *See Themis Capital, LLC v. Democratic Republic of Congo*, 881 F.Supp.2d

508, 520-21 (S.D.N.Y. 2012) (applying DRC law to determine whether the DRC had authority to

sign the credit agreement at issue); *Republic of Benin v. Mezei*, No. 06 CIV 870 JGK, 2010 WL

3564270, at *6 (S.D.N.Y. Sept. 9, 2010) ("Even if New York law applies, New York must look

to the law of Benin to determine the actual authority of an agent of the Benin government.")

(citing *Anglo– Iberia Under Writing Mgmt. Co. v. PT Jamsostek,* No. 97 Civ. 5116, 1998 WL

289711, at *3 (S.D.N.Y. June 4, 1998), *aff'd in relevant part,* 235 F. App'x 776, 782 (2d

Cir.2007) (applying Indonesian law to determine the actual authority of an Indonesian official)).

Otherwise, constitutional limitations on a state-owned entity's authority could be nullified

through the selection of another jurisdiction's law in a contract the entity had no authority to

enter into in the first place—an obviously nonsensical result.

Even if New York law governed the Pledge, the answer would be the same because, as

discussed more fully below, the underlying Indenture and the 2020 Notes purportedly secured by

the Pledge were illegally entered into and are void *ab initio*. Under New York law (and as a

matter of logic and common sense) a pledge cannot secure an obligation that never arose in the

first place. *See Hall & Co. v. Continental Cas. Co.*, 34 A.D.2d 1028 (3d Dep't 1970), *aff'd*, 30

N.Y. 517 (1972) (holding that a surety bond was a nullity where no underlying agreement ever

came into existence between the principal and the obligee, as there was nothing to which the

surety's obligation could attach); *Levison v. Illinois Surety Co.*, 222 N.Y. 280 (1918) (holding

that a surety's undertaking was unenforceable because it purported to guarantee payment under an assignment that was null and void). Furthermore, under New York law, if an obligation is invalid on account of illegality or violation of public policy, any agreement purportedly securing it is also invalid notwithstanding any purported waiver of defenses, as illegality and violations of public policy cannot be waived. *See In re Republic Airways Holdings Inc.*, 598 B.R. 118, 147 (Bankr. S.D.N.Y. 2019) ("Over the last hundred years . . . courts in New York and elsewhere have repeatedly refused to uphold contracts that violate public policy and have held that parties may not waive illegality as a defense.") (collecting cases); *see also* 63 N.Y. Jur. 2d Guaranty and Suretyship § 159 ("a guaranty agreement is not enforceable if the underlying obligation on which the guaranty is based is void.").

**B.** **Comity Favors Deferring to the Legitimate Venezuelan Government's Interpretation of its Own Laws**

Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 171 (2d Cir. 2008) (quoting *Hilton v. Guyot*, 159 U.S. 113, 143 (1895)). Under principles of comity, federal courts deciding questions of foreign law "should carefully consider a foreign state's views about the meaning of its own laws." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018). Here, the legitimate Venezuelan Government has delivered a letter to this Court setting forth the Venezuelan Republic's view that the Transaction Documents are invalid and unenforceable under Venezuelan law.[80]

This case is on all fours with *Pink,* 315 U.S. 203 (1942), in which the Supreme Court deferred to the Russian Government's declaration to the Court that its nationalization decree

---

[80]Letter from the Republic to the Honorable Katherine Polk Failla, *supra* at note 66.

applied to certain Russian assets in the U.S. As the Supreme Court recently observed, deference was especially appropriate in *Pink* because "[t]here was no indication that the declaration was inconsistent with the Soviet Union's past statements; and the declaration was consistent with expert evidence in point." *Animal Sciences*, 138 S. Ct. at 1875; *see also Spirits Int'l*, 809 F.3d at 743 (finding that the "declaration of a United States court that the executive branch of the Russian government violated its own law by transferring its own rights to its own quasi-governmental entity (FTE) would be an affront to the government of a foreign sovereign"); *Cornea v. U.S. Attorney Gen.*, 771 F. App'x 944, 948 (11th Cir. 2019) (finding that the district court had "made a manifest error of law" in not deferring to a submission that was "offered by the agency [of the Greek Government] tasked with interpreting Greek laws, consistent with the Greek authorities' past positions expressed in this case, and well-supported by the Greek Code of Criminal Procedure"). Likewise here, the application of Venezuelan law set forth in the Venezuelan Government's letter is consistent with past statements of the same legitimate government. And, as set forth below and in Professor Brewer's expert reports, the views expressed in the letter are consistent with the overwhelming majority of scholarly opinion. Accordingly, in the interest of comity, this Court should defer to the Venezuelan Government's considered view that, under a proper interpretation of its own laws, the Transaction Documents are invalid, null and void *ab initio*, and unenforceable, having been entered into without prior National Assembly authorization in violation of the Venezuelan Constitution.

C. **The Transaction Documents Are National Public Interest Contracts That Required Prior National Assembly Authorization Under the Venezuelan Constitution**

Article 150 of the Venezuelan Constitution provides, in relevant part, that "*[n]o contract in the municipal, state or national public interest shall be entered into . . . with companies not domiciled in Venezuela, or transferred to any of the same, without the approval of the*

29

*National Assembly*."[81]  Subsection 9 of Article 187 of the Constitution provides that one of the National Assembly's functions is "*[t]o authorize contracts of municipal, state and national public interest with States or official foreign entities or with companies not domiciled in Venezuela*."[82]  There is no dispute that public interest contracts with foreign/non-domiciled counterparties must be authorized by the National Assembly *prior* to execution.[83]  It is also undisputed that the Transaction Documents were entered into with companies not domiciled in Venezuela, including Defendants as the Trustee and the Collateral Agent for the 2020 Notes.

Thus, the Transaction Documents required prior National Assembly authorization because they are "national public interest contracts" under Venezuelan law, particularly considering the purported pledge of CITGO Shares.  In its May 2016 Resolution, the National Assembly interpreted national public interest contracts as "a special category of administrative contracts, inextricably related to an object that affects the collective interest of all citizens"—a category that includes contracts that could "seriously compromise the assets of the Republic or expose them to serious losses or international claims that might be detrimental to the sovereignty or integrity of the country, as well as contacts that due to its subject matter deserve such a qualification."[84]

Venezuela's oil industry indisputably affects the collective interest of all Venezuelan citizens because it involves the management of crucial public resources and is the main driver of

---

[81] 1999 VENEZUELAN CONSTITUTION art. 150 (emphasis added), Ex. 4.

[82] 1999 VENEZUELAN CONSTITUTION art. 187 (emphasis added), Ex. 4.

[83] Expert Report of ███████████████████ ("███ Report") at ¶ 12, Ex. 35.

[84] May 2016 Resolution (translated), Ex. 13.  In the opinion of Professor Brewer and many other Venezuelan legal scholars, any contract entered into by an organ of government or an entity within the Public Administration is, by virtue of that fact alone, a "public interest contract" within the meaning of Articles 150 and 187.9 of the Venezuela Constitution.  Brewer Report at ¶ 39.  There is no dispute that PDVSA and PDVSA Petróleo, which are "attached" to (and thus controlled by) Venezuela's Ministry of Petroleum and Mining, are part of the National Public Administration of the Venezuelan Republic, which is comprised of the *centralized* National Public Administration (organs of the national government itself) and the *decentralized* National Public Administration (entities such as public corporations and state-owned enterprises that are closely related to the government, being "attached" to a government ministry and subject to both public and private law to varying degrees).  *Id.* at ¶ 20.

the country's crippled economy and therefore the key to any hope of recovery. PDVSA was created as part of the nationalization of the Venezuelan oil industry and is the only state-owned enterprise whose state ownership is enshrined in the Venezuelan Constitution "[f]or reasons of economic and political sovereignty and national strategy." (Art. 303). In accordance with PDVSA's constitutionally prescribed role, PDVSA and PDVSA Petróleo "manage the [Venezuelan] oil industry" (Art. 303), of which CITGO is the foreign "crown jewel" and the most economically and strategically important foreign asset of national public interest. Accordingly, the Indenture and the Pledge, which were both executed by PDVSA and PDVSA Petróleo as part of a single, integrated transaction to refinance PDVSA debt relating to its oil industry activities in Venezuela, are national public interest contracts on account of the purported pledge of CITGO Shares to secure the 2020 Notes.[85] Indeed, the purported pledge of CITGO Shares sets the 2020 Notes Transaction apart from all prior PDVSA debt transactions.[86]

### D. The Lack of Required National Assembly Authorization Precluded Contract Formation and Valid Legal Existence of the Transaction Documents

It is undisputed that the Transaction Documents were not authorized by the National Assembly. Indeed, the National Assembly vigorously and publicly opposed the Exchange Offer *before* the Transaction Documents were executed.[87] Under Venezuelan law, if constitutionally required National Assembly authorization is not obtained, there can be no valid consent and thus no contract can be formed.[88] Accordingly, a public interest contract illegally executed without required National Assembly authorization is invalid and void *ab initio*. As Venezuela's Office of the Attorney General has recognized since 1959:

---

[85] *Id.* at ¶ 31, 42.
[86] Asamblea Nacional, *Regular Session of Tuesday, September 27, 2016. Discussions on the effects of PDVSA Bond Redemption* (translated), at 22, Ex. 14.
[87] As Defendants' counsel correctly argued in the *PDVSA Litigation Trust* case, "[u]nder Venezuelan law, the National Assembly's resolution [that a particular contract is a national public interest contract] is **conclusive**." *See* Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr.*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517, at 26, Ex. 3.
[88] Brewer Report, at § V.

there is unanimity in the administrative doctrine regarding that the 'authorizations' that according to the Constitution or the statutes, public officials or agents of Public Administration require in order to adopt or issue certain legal acts, *are a constitutive element and necessary for the 'consent;' consequently, the omission of the authorization does not vitiate the consent, but prevents it, impeding its legitimate manifestation; and being that consent is an essential element of the existence of the act, once it has been omitted, also the act, legally speaking, is inexistent.*[89]

(emphasis added). Given that the Transaction Documents were illegally executed without prior National Assembly authorization as required under Articles 150 and 187.9 of the Venezuelan Constitution, they are invalid, illegal, null and void *ab initio*, and entirely unenforceable, as are the 2020 Notes issued under the Indenture.[90]

### E. National Public Interest Contracts Need Not Include the Republic as a Party

Defendants' primary argument regarding Venezuelan law is that the Transaction Documents cannot be considered "national public interest contracts" because they were entered into by state-owned enterprises rather than the Republic itself. This argument is contrary to the overwhelming weight of Venezuelan legal authority and to what Defendants' own counsel has been arguing in the *PDVSA Litigation Trust* case, which also involves a contract entered into by PDVSA with a foreign/non-domiciled counterparty.

Defendants' Venezuelan law expert, ▮▮▮▮▮, asserts that it is "well settled" among Venezuelan legal scholars that "it is the *essence* of any Contract of National Interest that the Republic be a party to it"[91] and that Venezuela's highest court has "long held" as a matter of "binding judicial precedent" that this is "a requirement of Contracts of National Interest."[92] But

---

[89] *Report of the Office of the Attorney General to the National Congress 1959*, 624–25 (1960) (translated), Ex. 36.
[90] Brewer Report, at §§ V & VI.
[91] ▮▮▮ Report at ¶ 93, Ex. 35.
[92] *Id.* at ¶¶ 92. 94, 127.

Professor Brewer's rebuttal report exposes the falsity of these assertions in great detail.[93]  Widely

recognized as the world's foremost scholar of Venezuela public law, Professor Brewer's

opinions are particularly authoritative in this case because, as one of the drafters of the

Venezuelan Constitution, he proposed the inclusion of Article 150.[94]  He also drafted

Venezuela's Organic Law on Public Administration.[95]  While Professor Brewer's reports are

comprehensive in scope, a few basic points are sufficient to dispose of Defendants' argument:

*First*, the National Assembly's September 2016 and October 2019 Resolutions remain in

full force and effect, and the illegitimate Supreme Tribunal has not even purported to annul

them.  The National Assembly is Venezuela's only legitimate governmental body and the first-

instance interpreter of the Venezuelan Constitution.[96]  Thus, these resolutions, which were not

the first resolutions declaring PDVSA contracts invalid under Article 150,[97] stand as the last

word on whether the Transaction Documents are national public interest contracts that required

National Assembly authorization.

*Second*, no Supreme Tribunal decision rendered after 2015 is entitled to any recognition

by a U.S. court.  As set forth above, and as widely recognized in Venezuela and the international

community, the Supreme Tribunal lost all judicial independence after the opposition parties won

control of the National Assembly in the December 2015 parliamentary elections.[98]  From that

point on, the Supreme Tribunal functioned as an arm of the Maduro regime, issuing one

unconstitutional decision after another to curtail the National Assembly's powers.  These

---

[93]Expert Report of Allan R. Brewer-Carías Rebutting the Report of ██████████ ("Brewer Rebuttal Report"), at § III, attached as Exhibit B Declaration of Allan R. Brewer-Carías in Support of Plaintiffs' Motion for Summary Judgment.
[94]Brewer Report at ¶ 7.
[95]*Id*. at ¶ 5.
[96]*Id*. at ¶¶ 53, 73.
[97]*Id*. at ¶¶ 65 (citing prior National Assembly resolutions unrelated to the 2020 Notes Transaction).
[98]Before the new legislature could convene its first session, the outgoing legislature stacked the Supreme Tribunal with Maduro loyalists who then refused to refuse to swear in certain opposition legislators in violation of the Venezuelan Constitution.  *Jimenez*, 2019 WL 3526479, at *2.

decisions are what led the U.S. Government to declare the Supreme Tribunal illegitimate on account of its collusion with the Maduro regime in "usurp[ing] the authority of Venezuela's democratically-elected legislature, the National Assembly."[99]  Accordingly, the courts in the *Jimenez* and *Impact Fluid Sols.* cases gave no weight to the Supreme Tribunal's post-2015 decisions purportedly blocking opposition lawmakers from taking office, declaring null and void all actions of the National Assembly, arrogating to itself the National Assembly's legislative powers, and declaring the 2019 Transition Statute unconstitutional.  *Jimenez*, 2019 WL 3526479 at *2, 7; *see generally Impact Fluid Solutions*, Civ No. 4:19-cv-00654, Dkt. No. 55 (nowhere mentioning opinions of the Supreme Tribunal).  Likewise, this Court need not concern itself with the complexities of the Supreme Tribunal's 2016 decision in the *Brigitte Acosta Isasis* case, which is one of the main decisions on which ▮▮▮▮▮ relies.

  ***Third***, the centerpiece of Defendants' argument—the Supreme Tribunal's 2002 decision in the *Andrés Velásquez* case—is not contrary to the National Assembly's interpretation of the Transaction Documents as national public interest contracts requiring National Assembly authorization.  In that case, the Constitutional Chamber stated in *dicta* that "contracts concluded by the Republic through the competent organs of the National Executive to do so and whose purpose is determinant or essential to accomplishing the purposes and objectives of the Venezuelan State would be included within the species of national public interest contracts . . . ."  As Professor Brewer points out, nowhere did the Constitutional Chamber state that the concept of national public interest contracts includes *only* contracts entered into by the National Executive or that contracts entered into by public corporations or state-owned enterprises within the National Public Administration (which were not at issue in the case) cannot be national public interest contracts.  Indeed, the National Assembly has referred to the *Andrés Velásquez*

---

[99] *See supra* at note 61.

decision in declaring contracts entered into by PDVSA to be national public interest contracts.[100]
The National Assembly has also passed post-*Andrés Velásquez* resolutions authorizing joint
venture agreements entered into by PDVSA or certain of its subsidiaries as national public
interest contracts under Article 150.[101]

Furthermore, █████████ assertions are belied by post-*Andrés Velásquez* decisions
in which the Constitutional Chamber and other chambers of the Supreme Tribunal accepted
(without even a question being raised) that contracts entered into by public corporations and
state-owned enterprises within the National Public Administration were national public interest
contracts. Just a few months after *Andrés Velásquez*, in decision No. 953 of April 29, 2003, the
Constitutional Chamber expressly recognized as a national public interest contract an electricity
supply agreement entered into by a state-owned enterprise known as "EDELCA" with Brazilian
counterparties.[102] █████████ discreetly acknowledges this decision in a footnote to his
initial report, admitting that "*a state corporation [EDELCA] entered into an agreement that the
Court characterized as one of national interest.*"[103] In another footnote, █████████

---

[100] *Resolution rejecting the increase to forty percent in the equity stake of the Russian state-owned company Rosneft, partner of Petróleos de Venezuela S.A., in the mixed-ownership company Petromonagas, without approval of the modifications of the conditions governing the aforementioned resolution by the National Assembly pursuant to the constitutional and legal provisions governing the matter*, dated February 9, 2017 (translated), Ex. 37. In any event, the decision did not establish any "binding interpretation" that national public interest contracts must include the Republic itself as a party. In Venezuela's civil law system, there is no doctrine of stare decisis or binding authority, and Supreme Tribunal decisions are not a source of law except where the Constitutional Chamber (i) annuls a legislative act of general effect, in which case the interpretation is limited to the core "thema decidendum" or (ii) interprets a constitutional rule or principle in a binding fashion pursuant to Article 335 of the Venezuelan Constitution. Brewer Rebuttal Report at ¶ 40-43. Except in these circumstances, Supreme Tribunal decisions carry no more weight than the interpretations of legal scholars and other branches of government. *Id*. at ¶ 44. "Binding interpretations" pursuant to Article 335 are demarcated by (i) the "rule of explicitness"—that the binding character of the interpretation pursuant to Article 335 is explicitly declared in the text of the decision—and (ii) the "rule of publicity"—that the decision contains an order for its publication in the Official Gazette of the Republic on account of the binding interpretation. *Id*. at ¶¶ 50-51. No Constitutional Chamber discussion of public interest contracts, in Andrés Velásquez or any other decision, meets these criteria. *Id*. at ¶¶ 53-54.
[101] *See, e.g.*, Resolutions dated May 4, 2006, published in the Official Gazette No. 38.430, dated May 5, 2006 (translated), Ex. 47; Resolution dated Sept. 24, 2009, published in the Official Gazette No. 39.273, dated Sept. 28, 2009 (translated), Ex. 48.
[102] Brewer Rebuttal Report at ¶¶ 3, 9.
[103] █████ Report at ¶ 102 n. 139, Ex. 35.

acknowledges that "[t]he Political-Administrative Chamber [of the Supreme Tribunal] has also issued decisions related to Contracts of National Interest," including contracts entered into by *Diques y Astilleros de Nacionales S.A. (DIANCA)*, *Corporación Venezolana de Guayana (CVG)*, and *Compañía Anónima Venezolana de Televisión (VTV)*, which are all public corporations or state-owned enterprises that, like PDVSA and PDVSA Petróleo, are part of the decentralized National Public Administration of the Republic.[104]  Finally, in decision No. 1460 of July 12, 2007 (*Attorney General of the Republic II*)—another decision on which ████████ purportedly relies—the Constitutional Chamber presumed that promissory notes issued by a public corporation known as "BANDAGRO" were national public interest contracts subject to the requirements for such contacts in Article 245 of the Venezuelan Constitution.

In his rebuttal report, ████████ misleadingly portrays Professor Brewer as having suddenly contradicted a number of his prior writings, including some from recent years, by opining in this case that the *Andrés Velásquez* decision did not establish any binding interpretation of the concept of national public interest contracts.  The fact is that Professor Brewer's opinion has not changed at all.  A single footnote from a 2006 paper that was reprinted verbatim in numerous other publications inadvertently referred to the discussion in *Andrés Velásquez* of public interest contracts as a "binding interpretation."  The inadvertency of this isolated reference is conclusively demonstrated by the fact that the decision's discussion of public interest contracts does not meet the criteria for a "binding interpretation" under Article 335 of the Venezuelan Constitution *according to Professor Brewer's own prior[105] and*

---

[104]*Id.* at ¶ 104 n. 144.
[105] Allan R. Brewer-Carías, THE CONSTITUTION OF 1999 VOL. II (Editorial Jurídica Venezolana 2004) (translated), Ex. 38.

subsequent[106] *writings on the concept of binding interpretation—i.e.*, that the binding character of the interpretation under Article 335 must be expressly declared in the text of the decision itself (indeed, the decision does not even mention Article 335).[107]  In a book on Venezuelan administrative law originally published in 2013,[108] as well as in a 2017 article in a Venezuelan public law journal, Professor Brewer discussed the *Andres Valezquez* decision and did *not* state that it established a "binding interpretation."[109]

In short, there is virtually no support for ███████████ opinion regarding national public interest contracts.  Those who have interpreted the concept of national public interest contracts to include contracts entered into by public corporations and state-owned enterprises within the National Public Administration include:

- the National Assembly in numerous resolutions, including resolutions unrelated to the 2020 Notes Transaction;

- the Venezuelan Republic itself, as set out in the legitimate Venezuelan Government's letter to this Court;

- ████████████████████

- the Constitutional Chamber of the Supreme Tribunal in the above-referenced *EDELCA* (2003) and *Attorney General of the Republic II* (2007) cases;

- the Political-Administrative Chamber of the Supreme Tribunal in the above-referenced *Diques y Astilleros de Nacionales S.A. (DIANCA)*, *Corporación Venezolana de Guayana (CVG)*, and *Compañía Anónima Venezolana de Televisión (VTV)* cases;

---

[106]Allan R. Brewer-Carías, *The effects of constitutional sentences in Venezuela*, *in* 22 ANUARIO INTERNATCIONAL SOBRE JUSTICIA 19, 64 (2008) (translated), Ex. 39.

[107]Allan Randolph Brewer-Carías, *La Mutación de la Noción de Contratos de Interés Público Nacional Hecha Por la Sala Constitucional, para Cercenarle a la Asamblea Nacional sus Poderes de Control Político en Relación con la Actividad Contractual de la Administración Pública y sus Consecuencias*, *in* 151–52 REVISTA DE DERECHO PÚBLICO (2017), Ex. 40.

[108]ALLAN RANDOLPH BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA (2013), Ex. 41; ALLAN RANDOLPH BREWER-CARÍAS, ADMINISTRATIVE LAW IN VENEZUELA 132–33 (2d ed. 2015), Ex. 42.

[109]*See generally* Allan Randolph Brewer-Carías, *La Mutación de la Noción de Contratos de Interés Público Nacional Hecha Por la Sala Constitucional, para Cercenarle a la Asamblea Nacional sus Poderes de Control Político en Relación con la Actividad Contractual de la Administración Pública y sus Consecuencias*, *in* 151–52 REVISTA DE DERECHO PÚBLICO (2017), Ex. 40.

- Professor Brewer, who proposed the inclusion of Article 150 in the Constitution and who is widely regarded as the foremost scholar of Venezuelan public law in the world;

- Professor Juan Cristóbal Carmona Borjas, a distinguished member of the National Academy of Political and Social Sciences, who rendered an opinion on this matter to the National Assembly at the time of the Exchange Offer;

- Professor Román J. Duque-Corredor, also a member of the National Academy and a prominent public intellectual, who recently published an academic article addressing the constitutional issues relating to the 2020 Notes; and

- seven other distinguished professors, including Rafael Badell and Jesús Caballero Ortíz (contrary to ███████████ mischaracterization of their writings).[110]

Not even Defendants' own counsel agrees with their expert's erroneous opinion, having argued in the *PDVSA Litigation Trust* case (while relying on different experts) that "contracts with state-owned enterprises (like PDVSA) . . . may [] qualify as national public interest contracts that are 'null and void' without the constitutionally required National Assembly authorization."[111]

Under Venezuelan law, contracts entered into by PDVSA and PDVSA Petróleo can be national public interest contracts because those state-owned enterprises run Venezuela's nationalized oil industry to achieve the national public policy goals established in Article 303 of the Venezuelan Constitution. Accordingly, PDVSA and PDVSA Petróleo had no authority to execute the Transaction Documents and purportedly pledge a controlling interest in CITGO without prior authorization of the National Assembly.

---

[110]Brewer Rebuttal Report, at ¶ 5. Apart from Professor Eloy Lares Martínez, who affirmed that "national interest contracts are administrative contracts entered into by the National Public Administration" only to later express the contradictory view that the Republic must be a party, *no other Venezuelan public law scholar holds the opinion expressed by* ███████████ *in this case*. *Id*. at ¶ 80 (quoting Eloy Lares Martínez, *Contracts of National Interest*, *in* 1 LIBRO HOMENAJE AL PROFESOR ANTONIO MOLES CAUBET 117, 137 (1981)) (translated), Ex. 43. Contrary to ███████████ erroneous assertions, his opinion does not find support in the writings of the late Professor José Melich Orsini. *Id*. at ¶ 77.

[111]*See* Defendant's Motion to Dismiss, *PDVSA U.S. Litig. Tr.*, Case No. 1:18-cv-20818-DPG, Dkt. No. 517, at 26. Defendants' counsel went on to argue that the "National Assembly's refusal to approve" the contract at issue between PDVSA and a U.S. litigation trust rendered it "null and void." *Id*. at 26-27.

## III.    DEFENDANTS' DEFENSES FAIL AS A MATTER OF LAW[112]

Defendants' first defense ("failure to state a claim") and part of their ninth defense

("insufficiency of the evidentiary record") fail for the obvious reason that Plaintiffs have stated

perfectly cognizable claims for declaratory relief on the evidence presented.  Defendants' second

through fourth and sixth through eighth defenses and the remainder of their ninth defense, which

are all equitable in nature, fail at the outset because "equitable defenses are unavailable when the

rights being pressed by a party are based upon a void document."  *See Sardanis v. Sumitomo

Corp.*, 282 A.D.2d 322, 324 (1st Dep't 2001); *see also Draper v. Georgia Prop*s., Inc., 230

A.D.2d 455, 460 (1st Dep't 1997), *aff'd*, 94 N.Y.2d 809 (1999) (where contract provisions are

void and unenforceable, the "contention that [defendant's] affirmative defenses and

counterclaims should be reinstated is without merit[.]").  Equally fundamental, "a party to an

illegal undertaking cannot come into a court either of law or equity and ask to have his illegal

contract carried out."  *Roberts v. Criss*, 266 F. 296, 301 (2d Cir. 1920); *see also Stone v.

Freeman*, 298 N.Y. 268, 271 (1948) ("It is the settled law of this State (and probably of every

other State) that a party to an illegal contract cannot ask a court of law to help him carry out his

illegal object"); *Strauss Linotyping Co. v. Schwalbe*, 159 A.D. 347, 350 (1st Dep't 1913) ("But

an illegal contract of this character cannot be given validity by ratification.  The agreement is

void in its inception and thereafter continues to be void.").

Furthermore, Defendants cannot establish an essential element of apparent authority—

reasonable reliance—because, as set forth above, the relevant limitations on Plaintiffs' authority

to enter into the Transaction Documents were a matter of public law.  Moreover, the highly

---

[112]Defendants have not explicitly raised and, as far as Plaintiffs can tell, are not intending to raise any defenses or counterclaims arising under Venezuelan law.  Without conceding that New York law applies, Plaintiffs demonstrate that Defendants' defenses and counterclaims fail under New York law and reserve the right to address any defenses or counterclaims under Venezuelan law in subsequent briefing.

sophisticated holders of the 2020 Notes knew (or certainly should have known[113]) from the September 2016 Resolution and numerous other sources that the 2020 Notes Transaction was at risk of invalidation. *See, e.g., Highland Capital Mgmt. LP v. Schneider,* 607 F.3d 322, 328 (2d Cir. 2010) ("A party cannot claim that an agent acted with apparent authority when it knew, or should have known, that [the agent] was exceeding the scope of its authority.") (citation and quotation marks omitted). Nor can Defendants show that actions of the principal, in this case the Venezuelan Government, created the appearance of authority. On the contrary, the National Assembly, the only legitimate branch of the Venezuelan Government, explicitly rejected the Pledge, called for an investigation into the entire Exchange Offer, and withheld its authorization of the Transaction Documents. *See* September 2016 Resolution, *supra*.

Defendants likewise cannot satisfy an essential element of equitable estoppel—a misrepresentation of fact—because no facts have been or are alleged to have been misrepresented, and "an opinion or misrepresentation of law will not suffice." *In re Zarro*, 268 B.R. 715, 722 (Bankr. S.D.N.Y. 2001). Nor can Defendants establish the element of both waiver and ratification that Plaintiffs had a right to waive requirements of the Venezuelan Constitution or to ratify the Transaction Documents despite the National Assembly's refusal to authorize them. *See City of Zanesville, Ohio v. Mohawk Data Scis. Corp. ,* 97 A.D.2d 64, 67 (4th Dep't 1983); *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp.3d 393, 468 (S.D.N.Y. 2018) ("Ratification requires both 'knowledge of a defect in the act to be confirmed' and 'the right to reject or ratify it.'") (citations omitted). Any contrary decision would also violate act of state and comity principles, as this Court would effectively be invalidating sovereign acts of the National Assembly taken within Venezuela's territory. In any event, the 2020 Notes Transaction cannot be compared to any other PDVSA debt transaction because no prior transaction involved the

[113]Hinman Report ¶¶ 38-52.

purported pledged of a controlling interest in CITGO.

Defendants also cannot establish at least two essential elements of their fifth defense of laches—undue delay and prejudice. *See Cohen v. Krantz*, 227 A.D.2d 581, 582 (2d Dep't 1996) (setting forth the elements of laches); *NML Capital, Ltd. v. Republic of Arg.*, 699 F.3d 246, 261 (2d Cir. 2012) (same). Plaintiffs filed this action less than a year after formal recognition of Interim President Guaidó and his appointment of the PDVSA Ad Hoc Board. No "undue delay" resulted while the newly recognized Venezuelan Government was taking shape and organizing its legal affairs. Further, this action was filed within three years of the execution of the Transaction Documents, well within the six-year statute of limitations applicable to contract claims, which would not even apply in this case because a "a statute of limitations 'does not make an agreement that was void at its inception valid by the mere passage of time.'" *Faison v. Lewis*, 25 N.Y.3d 220, 226 (2015) (*quoting Riverside Syndicate, Inc. v. Munroe*, 10 N.Y.3d 18, 24 (2008)). There was no prejudice as a result of any purported delay, as Defendants were on notice of the invalidity risks prior to entering into the Transaction Documents. *Saratoga Cty Chamber of Commerce v. Pataki*, 100 N.Y.2d 801, 818 (2003) ("[T]he prejudice caused by a loss of expected profits based on a predictably vulnerable compact is not the sort of prejudice that supports a defense of laches.").

Defendants' tenth affirmative defense (act of state and comity) fails as well. The act of state defense fails because, among other reasons, PDVSA's actions as a state-owned enterprise under Maduro's control were not acts of a legitimate "state" but rather an illegitimate regime. *Underhill*, 168 U.S. 250; *Oetjen,* 246 U.S. 297. Defendants' comity defense likewise fails because the only U.S.-recognized, legitimate Venezuelan Government considers the Transaction

41

Documents to be invalid and unenforceable.[114]

## IV.   DEFENDANTS' COUNTERCLAIMS FAIL AS A MATTER OF LAW

Defendants' first, second, third, fourth, and fifth counterclaims—which seek declarations

that the Transaction Documents are valid and enforceable, that an Event of Default under the

Indenture has occurred, and that the Trustee and the Collateral Agent are entitled to sell the

CITGO Shares—and their sixth, seventh, ninth, tenth, and eleventh counterclaims—sounding in

breach of contract and breach of warranty—fail as a matter of law because the Transaction

Documents are invalid. *See, e.g., Carmine v. Murphy*, 285 N.Y. 413, 416 (1941) ("no right of

action can spring out of an illegal contract"); *Estate of Leventhal ex rel. Bernstein v. Wells Fargo

Bank, N.A.*, No. 14 Civ. 8751 (ER), 2015 WL 5660945 at *9 n.14 (S.D.N.Y. Sept. 25, 2015)

(noting that if the agreements at issue "are invalid, Plaintiff cannot simultaneously seek to

enforce them through a breach of contract claim" under New York law).

Defendants' twelfth counterclaim for a *quantum meruit* recovery also fails as a matter of

law because Defendants cannot recover for services performed under illegal or invalid contracts.

*See Fabrizio & Martin, Inc. v. Bd. of Educ.*, 290 F. Supp. 945, 955 (S.D.N.Y. 1968) ("plaintiff

may not . . . recover in *quantum meruit* under an invalid contract ."); *Michael R. Gianatasio, PE,

P.C. v. City of New York*, 53 Misc. 3d 757, 774 (N.Y. Sup. Ct. 2016), *aff'd sub nom.* 159 A.D.3d

659 (1st Dep't 2018) ("A plaintiff may not recover in *quantum meruit*. . . where, as here, there is

a contract governing the work which is illegal and unenforceable.").

To succeed on their fourth counterclaim for unjust enrichment, Defendants must prove

(1) that Plaintiffs were enriched, (2) at Defendants' or the noteholders' expense, and (3) that

equity and good conscience militate against permitting Plaintiffs to retain what Defendants are

seeking to recover. *See Briarpatch Ltd., L.P. v. Phoenix. Pictures, Inc.*, 373 F.3d 296, 306 (2d

---

[114]Letter from the Republic to the Honorable Katherine Polk Failla, *supra* at note 66.

Cir. 2004) (enumerating the elements of an unjust enrichment claim).  This counterclaim fails at the outset because Plaintiffs have not been "enriched" by the 2020 Notes Transaction.  In fact, as Plaintiffs' expert David Hinman makes clear, PDVSA and PDVSA Petróleo incurred *more debt* in exchange for only a relatively short maturity extension that benefited only the Maduro regime.[115]  While one of Defendants' economics experts, Dr. Porzecanski, purports to rebut Mr. Hinman's opinion that Plaintiffs were not enriched, he actually only disputes that the terms of the Exchange Offer were unusually favorable to the noteholders, not that PDVSA and PDVSA Petróleo ended up deeper in debt.[116]  Nor does he provide any independent analysis from which the Court could conclude that PDVSA and PDVSA Petróleo were enriched by being relieved of their 2017 Notes obligations.  Defendants' unjust enrichment counterclaim fails as to PDV Holding for the simple reason that it had nothing to do with the 2017 Notes and thus did not, and could not have, received any "specific and direct benefit" (as required for an unjust enrichment claim) from PDVSA and PDVSA Petróleo being relieved of their 2017 Notes obligations.  *See M+J Savitt, Inc. v. Savitt*, No. 08 CIV. 8535 (DLC), 2009 WL 691278, *10 (S.D.N.Y. Mar. 17, 2009) ("It is not sufficient for defendant to receive some indirect benefit—the benefit received must be 'specific and direct' to support an unjust enrichment claim.").[117]

Finally, Defendants' unjust enrichment counterclaim fails because "equity and good

---

[115]Hinman Report ¶ 77.

[116]Rebuttal Declaration of Professor Arturo C. Porzecanski in Response to Portions of the Expert Report by David C. Hinman, at  ¶¶ 2(e), 87, 88, 91, 92, Ex. 44.

[117]Even if Defendants could prove that Plaintiffs were somehow enriched by the 2020 Notes Transaction, any enrichment was not at the noteholders' expense.  As set forth above, Mr. Hinman has demonstrated that, regardless of when 2017 Notes were purchased, noteholders that accepted the Exchange Offer have lost little or no money on their investments and, in most purchase scenarios, have realized substantial positive returns.  The fact that the noteholders could have made even more money had PDVSA not stopped paying interest and principal on the 2020 Notes is irrelevant.  In any event, had the 2020 Notes Transaction not occurred, the Maduro regime would almost certainly have defaulted on the 2017 Notes, causing their market value to plummet and ending the flow of interest and principal.  *See* Hinman Report ¶ 34 ("[T]he Exchange Offer was seen as an attempt by the Maduro regime to buy time and stave off default that seemed inevitable unless oil prices recovered, or the country obtained other sources of financing.").

conscience" does not favor them. *See Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 739-40 (S.D.N.Y.), *aff'd*, 505 F. App'x 45 (2d Cir. 2012) ("'The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'") (quoting *Dragon Inv. Co. II LLC v. Shanahan*, 409 A.D.3d 403, 405 (1st Dep't 2008)).  The noteholders knew that the Transaction Documents were potentially invalid and that the Exchange Offer served to prop up Maduro by providing his authoritarian regime with a financial lifeline. ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████[118]

Ashmore was also aware that, under the illegitimate Maduro regime, Venezuela was "one of the most miserable, mismanaged, hopeless countries on the planet," but it nonetheless saw Venezuela as an opportunity to "make money."[119]  In addition, Ashmore's correspondence immediately following the National Assembly's September 2016 Resolution makes clear that it understood the resolution's significance. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[118] ████████████████████████████████ *see also* Hinman Report ¶ 36–57 (detailing the extensive market commentary on the risk that the 2020 Notes were invalid and noting that this commentary "highlighted the fact that the Venezuelan National Assembly had publicly rejected the purported pledge of CITGO Collateral for the 2020 Notes issued by PDVSA.").

[119] *See* Hinman Report ¶ 30; *see also* Email from Javier Kulesz to Jan Dehn, "Jefferies LatAm Sovns – Venezuela commentary," *Jefferies*, August 1, 2016. (ASH_00000018 – 21), Ex. 46 (August 1, 2016 Jefferies report explaining: "[w]e find it difficult to envision a scenario within which such an authoritarian and corrupt government is ousted peacefully through a referendum.  At this point, there should be little doubt that Chavismo's ultimate objective is to perpetuate itself in power, irrespective of the costs.  If those costs involve the outright violation of the constitution, ignoring international pressures or even using violence, so be it.").  For these same reasons, Defendants' counterclaims are barred by the doctrines of unclean hands and *in pari delicto*, and Plaintiffs are entitled to summary judgment on their third and fifth affirmative defenses.



"[121] But the risk was clear.

"[122] This Court should not invoke equitable principles to rescue highly sophisticated hedge fund managers and financial institutions from a risk of which they were fully aware when they decided to extend a financial and political lifeline to a collapsing authoritarian regime.

## **CONCLUSION**

For the forgoing reasons, Plaintiffs respectfully request that their motion for summary judgment be granted in its entirety.

*[remainder of page left intentionally blank]*

---

[120]
[121] *Id.*
[122] *Id.*

Dated:  June 10, 2020                              Respectfully submitted,


                                                   /s/ Kurt W. Hansson
                                                   Kurt W. Hansson
                                                   James R. Bliss
                                                   James B. Worthington

                                                   PAUL HASTINGS LLP
                                                   200 Park Avenue
                                                   New York, New York 10166
                                                   Telephone: (212) 318-6000
                                                   Facsimile: (212) 319-4090
                                                   kurthansson@paulhastings.com
                                                   jamesbliss@paulhastings.com
                                                   jamesworthington@paulhastings.com

                                                   *Attorneys for Plaintiffs and Counterclaim
                                                   Defendants Petróleos de Venezuela, S.A. and
                                                   PDVSA Petróleo, S.A.*

                                                   /s/ Jeffrey B. Korn
                                                   Jeffrey B. Korn
                                                   Michael Gottlieb
                                                   Nicholas Reddick
                                                   WILLKIE FARR & GALLAGHER LLP
                                                   787 Seventh Avenue
                                                   New York, NY 10019
                                                   Telephone: (212) 728-8000
                                                   Facsimile: (212) 728-8111
                                                   jkorn@willkie.com
                                                   1875 K Street NW
                                                   Washington, DC  20006-1238
                                                   Telephone: (202) 303-1442
                                                   Facsimile: (202) 303 2442
                                                   mgottlieb@willkie.com
                                                   nreddick@willkie.com

                                                   *Attorneys for Plaintiff and Counterclaim Defendant
                                                   PDV Holding, Inc.*

## APPENDIX A

| PLAINTIFFS' CLAIMS | |
|---|---|
| First Cause of Action (on behalf of PDVSA and PDVSA Petróleo) | Declaratory judgment that the 2020 Notes and the Indenture are invalid, illegal, null and void *ab initio*, and unenforceable |
| Second Cause of Action (on behalf of all Plaintiffs) | Declaratory judgment that the Pledge is invalid, illegal, null and void *ab initio*, and unenforceable |
| **DEFENDANTS' AFFIRMATIVE DEFENSES** | |
| First Defense | Failure to state a claim upon which relief can be granted |
| Second Defense | Unclean hands and/or inequitable conduct |
| Third Defense | Failure to disclose known Venezuelan constitutional violations; acceptance of the benefits of the Exchange Offer; bad faith and prejudicial delay in asserting purported claims |
| Fourth Defense | Consent, acquiescence, waiver, promissory estoppel, and/or ratification |
| Fifth Defense | Laches |
| Sixth Defense | Estoppel by recitals and/or equitable estoppel |
| Seventh Defense | *In pari delicto* |
| Eighth Defense | Apparent authority |
| Ninth Defense | Inequitable conduct, lack of mutuality, and insufficiency of the evidentiary record |
| Tenth Defense | Act of state doctrine and/or comity |
| **DEFENDANTS' COUNTERCLAIMS** | |
| First Cause of Action (Defendants against all Plaintiffs) | Declaratory judgment that the 2020 Notes are valid, legal, and enforceable |
| Second Cause of Action (Defendants against PDVSA and PDVSA Petróleo) | Declaratory judgment that the Indenture is valid, legal, and enforceable |
| Third Cause of Action (Defendants against all Plaintiffs) | Declaratory judgment that the Pledge is valid, legal, and enforceable |
| Fourth Cause of Action (Defendants against PDVSA and PDVSA Petróleo) | Declaratory judgment that one or more Events of Default under the Indenture have occurred |
| Fifth Cause of Action (Defendants against all Plaintiffs) | Declaratory judgment that, subject to obtaining any necessary United States government approvals, the Trustee is entitled to direct the Collateral Agent to sell the collateral, and the Collateral Agent is entitled to sell the collateral |
| Sixth Cause of Action (Trustee against | Breach of contract / payment of amounts due |

| | |
|---|---|
| PDVSA) | under the Indenture pursuant to Indenture Sections 5.01(f) and 5.01(m) |
| Seventh Cause of Action (Trustee against PDVSA Petróleo) | Breach of contract / payment of amounts due under guarantee pursuant to Indenture Sections 5.01, 7.01, and 7.04 |
| Eighth Cause of Action (against all Plaintiffs) | Unjust enrichment |
| Ninth Cause of Action (against PDVSA Petróleo) | Breach of warranty |
| Tenth Cause of Action (against PDV Holding) | Breach of warranty |
| Eleventh Cause of Action (against PDVSA and PDVSA Petróleo) | Breach of contract and indemnification of fees, costs, and expenses |
| Twelfth Cause of Action (against PDVSA and PDVSA Petróleo) | *Quantum meruit* |
| **PLAINTIFFS' AFFIRMATIVE DEFENSES** | |
| First Defense | Failure to state a claim upon which relief can be granted |
| Second Defense | The Indenture and the Pledge are invalid, illegal, and null and void *ab initio* because they were entered into in violation of the Venezuelan Constitution |
| Third Defense | Unclean hands |
| Fourth Defense | Equitable estoppel |
| Fifth Defense | *In pari delicto* |
| Sixth Defense | Act of state doctrine |
| Seventh Defense | Comity |
| Eighth Defense | Defendants' counterclaims are barred by the U.S. sanctions regime |