Exhibit 1

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

KOCH MINERALS SÀRL, KOCH NITROGEN
INTERNATIONAL SÀRL,

       *Plaintiffs*,

       *v.*

BOLIVARIAN REPUBLIC OF VENEZUELA,

       *Defendant*.

Misc. Action No: 22-mc-156-UNA

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A WRIT OF ATTACHMENT *FIERI FACIAS*

OF COUNSEL:

Alexander A. Yanos *pro hac vice pending*
Rajat Rana *pro hac vice pending*
Robert Poole *pro hac vice pending*
ALSTON & BIRD, LLP
90 Park Avenue, 15th Floor
New York, NY 10016-1387
212-210-9400
alex.yanos@alston.com
rajat.rana@alston.com
robert.poole@alston.com

DATED: October 7, 2022

Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100
ljones@pszjlaw.com
pkeane@pszjlaw.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page(s)**

NATURE OF PROCEEDINGS ........................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 2

STATEMENT OF FACTS ................................................................................................. 4

I.     The Arbitration Award And Judgment ................................................................. 4

II.    This Court Found PDVSA To Be Venezuela's Alter Ego In August 2018 And
       Authorized Attachment Of The PDVH Shares Accordingly. .............................. 5

III.   Events Subsequent To This Court's August 2018 Alter Ego Decision In
       Crystallex. ........................................................................................................... 6

ARGUMENT .................................................................................................................. 11

I.     The Court Should Give Collateral Estoppel Effect to its 2018 Alter Ego Finding
       Since Venezuela Incurred Liability at that Time. ............................................. 12

       A.     The Court's Prior Decision Finding that the "Pertinent Time" for the Alter
              Ego Analysis Was the Time of Filing the Writ Was Incorrect and
              Inequitable. ............................................................................................. 12

       B.     The Proper Time to Assess Alter Ego Liability is at the Time the Principal
              Debtor Incurred Liability. ...................................................................... 15

II.    Alternatively, A Writ Of Attachment Against PDVH Shares Owned By PDVSA
       Is Appropriate Because PDVSA Remains Venezuela's Alter Ego Under The
       Guaidó Government. .......................................................................................... 18

       A.     The *Crystallex* Alter Ego Decision Should Have The Effect Of Collateral
              Estoppel, At Least Through August 2018. ............................................. 18

       B.     Events Subsequent To The Court's August 2018 Alter Ego Finding Do
              Not Change The Fact That PDVSA Is The Alter Ego Of The Venezuelan
              State. ....................................................................................................... 19

              1.     PDVSA Is Controlled Absolutely For Political Purposes By The
                     Guaidó Government. ................................................................... 20

              2.     The Guaidó Government uses PDVSA as the government's asset. .......... 22

              3.     Consistent with its domination of PDVSA for political ends, the
                     Guaidó Government requires the instrumentality to obtain
                     approvals for ordinary business decisions from a political actor. ............. 24

4.     The Guaidó Government ignores the instrumentality's separate
status or ordinary corporate formalities and causes it to act directly
at the instruction of the State. ................................................................... 26

C.     Used For Commercial Activity ........................................................................... 28

III.   The United States 2020 Statement of Interest In *Crystallex* Confirms The
Continuing Alter Ego Relationship Between PDVSA And The Venezuelan State.......... 29

IV.    Granting Plaintiffs' Motion Does Not Conflict With The United States Venezuela
Sanctions Or Broader Foreign Policy Goals. .................................................... 30

CONCLUSION.............................................................................................. 31

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bradburn Parent Teacher Store, Inc. v. 3M*,
No. 02-7676, 2005 U.S. Dist. LEXIS 5315 (E.D. Pa. Mar. 30, 2005).....................................18

*Chicago Florsheim Shoe v. Cluett, Peabody & Co.*,
826 F.2d 725 (7th Cir. 1987) ................................................................................................16

*City of Almaty v. Ablyazov*,
No. 15-CV-5345 (ASN), 2019 U.S. Dist. LEXIS 55183 (S.D.N.Y. Mar. 29, 2019) ..............16

*Connors v. Peles*,
724 F. Supp. 1538 (W.D. Pa. 1989)........................................................................................16

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
932 F.3d 126 (3d Cir. 2019), *cert. denied*, *Bolivarian Republic of Venez. v. Crystallex
Int'l Corp.*, 206 L.Ed.2d 936 (2020)........................................................................6, 17, 28, 29

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
No. 1:17-mc-00151 (D. Del. Dec. 12, 2019), D.I. 154 ..............................................2, 5, 14, 18

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
No. 1:17-mc-00151-LPS (D. Del. July 16, 2020), D.I. 212-1 .................................................29

*Crystallex International Corporation v. Bolivarian Republic of Venezuela*,
333 F. Supp. 3d 380 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019) ............2, 5, 17, 22, 26

*Equal Rights Ctr. v. Equity Residential*,
No. CCB-06-1060, 2016 U.S. Dist. LEXIS 44027 (D. Md. Mar. 31, 2016) ..........................16

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983)......................................................................................................... passim

*Gulf Petro Trading Co. v. Nigerian Nat'l Petro. Corp.*,
512 F.3d 742 (5th Cir. 2008) ................................................................................................14

*In re Wolf*,
595 B.R. 735 (Bankr. N.D. Ill. 2018) ....................................................................................16

*Jiménez v. Palacios*,
No. 2019-0490-KSJM, 2019 Del. Ch. LEXIS 288 (Del. Ch. Aug. 2, 2019), *aff'd,* 237
A.3d 68 (Del. July 22, 2020)...................................................................................7, 8, 19, 20

*Kessinger v. Gen. Mining Union Corp.*,
No. 85-3092, 1986 U.S. Dist. LEXIS 31038 (C.D. Ill. Mar. 26, 1986)...................................16

*Koch Minerals Sàrl v. Bolivarian Republic of Venez.*,
No. 1:17-cv-2559-ZMF (D.D.C. Nov. 28, 2017), D.I. 7 .....................................................4, 5

*Koch Minerals Sàrl, et. al. v. Bolivarian Rep. of Venez.*,
No. 1:17-cv-02559-ZMF, D.I. 53 ...............................................................................27

*Northrop Grumman Ship Systems, Inc. v. Ministry of Defense of the Bolivarian Republic of Venezuela*,
No. 1:20-mc-257 (D. Del. Feb. 19, 2021)........................................................................8, 27

*Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*,
553 F. Supp. 962 (N.D. Ill. 1982) ...............................................................................19

*OI European Grp. B.V. v. Bolivarian Rep. of Venez.*,
No. 19-290-LPS, 2022 U.S. Dist. LEXIS 36631 (D. Del. Mar. 2, 2022) ...............................30

*OI European Grp. B.V. v. Bolivarian Republic of Venez.*,
No. 1:19-mc-00290 (D. Del. Dec. 23, 2019), D.I. 28 ..........................................................6

*Patin v. Thoroughbred Power Boats, Inc.*,
294 F.3d 640 (5th Cir. 2002) .....................................................................................12

*Pearson v. Component Tech. Corp.*,
247 F.3d 471 (3d Cir. 2001).......................................................................................12

*Petroleos De Venez. S.A. et al v. MUFG Union Bank, N.A. et al*,
No. 1:19-cv-10023 (S.D.N.Y. June 15, 2020), D.I. 117 ..................................................7, 23

*Rusoro Mining Limited v. Bolivarian Republic of Venez.*,
1:21-mc-00481-LPS, D.I. 4-1 ......................................................................................6

*Trs. of the Heating, Piping & Refrigeration Pension Fund v. Conditioned Air Sys.*,
No. CCB-12-604, 2014 U.S. Dist. LEXIS 41981 (D. Md. Mar. 28, 2014) .............................17

*Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund v. B&L Moving & Installation, Inc.*,
No. 16-CV-4734 (GBD) (JLC), 2017 U.S. Dist. LEXIS 157756 (S.D.N.Y. Sep. 26, 2017) .......................................................................................................................12

*Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*,
140 F. Supp. 2d 447 (E.D. Pa. 2001), *aff'd sub nom.*, *Trs. of Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188 (3d Cir. 2003)..................15

*Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*,
332 F.3d 188 (3d Cir. 2003)...........................................................................12, 14, 15

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*,
608 F. Supp. 1261 (S.D.N.Y. 1985).............................................................................16

RULES

Local Rule 69.1 ...................................................................................................................2

Federal Rule of Civil Procedure 69(a)(1) ..........................................................................1

STATUTES

8 Del. C. § 169 ...................................................................................................................2

8 Del. C. § 324(a) ...............................................................................................................1

10 Del. C. § 5031 ................................................................................................................1

9 U.S.C. § 207 ..................................................................................................................14

9 U.S.C. § 302 ..................................................................................................................14

Foreign Sovereign Immunities Act, generally ...................................................................6

    22 U.S.C. § 1650(a) ..............................................................................................1, 11, 28

    28 U.S.C. § 1610(c) ......................................................................................................5

    28 U.S.C. § 1963 .......................................................................................................1, 5

31 C.F.R. § 591.407 ..........................................................................................................30

OTHER AUTHORITIES

Executive Order No. 13857, 84 Fed. Reg. 509, 509–10 (Jan. 25, 2019) ..........................29

Executive Order No. 13884, 84 Fed. Reg. 38843, 38843–45 (Aug. 5, 2019) ..................30

Inter–American Convention on International Commercial Arbitration [opened for
    signature Jan. 30,1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245] ...........................14

Republica Bolivariana de Venezuela, Asamblea Nacional, CENTRO DE COMUNICACIÓN
    NACIONAL (Oct. 17, 2019) .......................................................................................24

Statement of Interest In *Crystallex* .................................................................................29

Statement Recognizing Venezuelan National Assembly President Juan Guaidó as the
    Interim President of Venezuela, THE WHITE HOUSE (Jan. 23, 2019) .........................7

"Statute to Govern the Transition Toward Democracy to Reestablish the Validity of the
    Constitution of the Bolivarian Republic of Venezuela" ("Transition Statute") ......8

TAL CUAL DIGITAL (July 24, 2022), https://talcualdigital.com/pj-exigira-a-la-an-de-2015-
    transparencia-en-el-manejo-de-activos/ ................................................................................10

Yanos Dec. Ex. 41 ........................................................................................................................11

Plaintiffs and Arbitration Award Creditors Koch Minerals Sàrl ("KOMSA") and Koch Nitrogen International Sàrl ("KNI") (collectively "Plaintiffs"), by and through the undersigned counsel, respectfully submit this brief in support of their motion for an order authorizing the Clerk of the Court to issue a writ of attachment *fieri facias* ("*fi. fa.*") on shares of PDV Holding, Inc. ("PDVH"), a Delaware corporation fully-owned by Petróleos de Venezuela S.A. ("PDVSA"), the state oil company and alter ego of judgment debtor the Bolivarian Republic of Venezuela ("Venezuela"), conditioned upon evidence that either: (*i*) the Office of Foreign Assets Control ("OFAC") has authorized the issuance and service of such writ; or (*ii*) the relevant sanctions currently prohibiting the transfer of PDVH shares are removed or modified so that such a writ is permissible without a license.  Plaintiffs seek this relief in accordance with Section 1610(a)(6) of the Foreign Sovereign Immunities Act ("FSIA"), Rule 69(a)(1) of the Federal Rules of Civil Procedure, and Sections 5031 (10 Del. C. § 5031) and 324 (8 Del. C. § 324(a)) of the Delaware Code.

## NATURE OF PROCEEDINGS

On February 22, 2022, the United States District Court for the District of Columbia entered a consolidated final judgment ("the Judgment") enforcing an international arbitration award rendered against Venezuela in favor of Plaintiffs in the amount of US$ 306.95 million plus costs and interest.  *See* D.I. 1 (detailing judgment in favor of Plaintiffs).  The D.C. District Court did so pursuant to 22 U.S.C. § 1650a(a), which mandates the registration and enforcement of valid international arbitral awards rendered pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, 17 U.S.T. 1270, 55 U.N.T.S. 159 (1965) ("ICSID Convention" or "Convention"), with "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."  Venezuela chose not to appeal.  Plaintiffs have since registered the Judgment in this Court pursuant to 28 U.S.C. §

1963 on March 31, 2022.  *See* D.I. 1.  Because Venezuela continues to fail to pay the amount owed under the Judgment, Plaintiffs now move this Court to specifically authorize Plaintiffs' conditional attachment of the shares of PDVH which belong to Venezuela through its alter ego, PDVSA.[1]

## SUMMARY OF ARGUMENT

The question before the Court is whether PDVSA is Venezuela's alter ego, such that PDVSA's assets in the United States may be deemed commercial assets of Venezuela held through its alter ego and thus subject to Plaintiffs' attachment.[2]  As shown below, the answer to that question is "yes."

1.      The Court has reached this conclusion before, and that conclusion should be given the effect of collateral estoppel.  In August of 2018, the Court found that PDVSA was the alter ego of Venezuela and authorized attachment of PDVH's shares in *Crystallex International Corporation v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 391 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019) ("*Crystallex I*").  Subsequently, in an Order dated December 12, 2019, the Court declined to give collateral estoppel effect to its alter ego finding for the benefit of other judgment creditors of Venezuela, citing the potential effect of intervening changes in circumstances on its alter ego analysis, including the United States' decision in January of 2019 to transfer its recognition of Venezuela's legitimate government from that headed by Mr. Nicolás Maduro to that led by Mr. Juan Guaidó.  *See* Memorandum Order Regarding Pending Motions and Stay, *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, No. 1:17-mc-00151 (D. Del. Dec. 12, 2019), D.I. 154 at 13–17.

---

[1] In accordance with Local Rule 69.1, Plaintiffs submit a proposed writ of attachment *fieri facias*, as well as a praecipe, with this motion.  *See* Yanos Decl. Exs. 1, 2.  References to "Yanos Decl. Ex. [_]" are to the exhibits attached to the supporting Declaration of Alexander A. Yanos, dated October 7, 2022, which Plaintiffs attach to this Motion.

[2] PDVH's shares are located in Delaware as a matter of law.  *See* 8 Del. C. § 169 ("For . . . purposes of . . . attachment [and] garnishment . . . the situs of the ownership of the capital stock of all corporations existing under the laws of this State . . . shall be regarded as in this State.").

The Court should analyze a debtor's alter ego status based on the time that the debtor incurred the relevant liability.  Such an analysis would simultaneously give effect to the inherent logic of the alter ego doctrine (if a debtor has an alter ego on the date a debt arose, then such debt is also the alter ego's debt, how could a restructure of a relation between alter egos erase that debt?) and prevent judgment debtors from escaping their liabilities by buying time to reshape their corporate structures.  Here, the extent of Venezuela's liability was decided when the adverse award was amended in April of 2018, adjusting the amount of award.  Because the Court's previous alter ego analysis found that PDVSA was the alter ego of Venezuela up to August of 2018, that decision should be given the effect of collateral estoppel.

2.      Even if the Court were to analyze the relationship between PDVSA and Venezuela as of today's date, the same result should apply: Since January of 2019, Mr. Guaidó's government has continuously treated PDVSA as a part of the Venezuelan State and has continuously used its assets in commerce no less than Mr. Maduro's regime did (and, though no longer recognized as the legitimate government by the United States, continues to do).  Plaintiffs should therefore be allowed to attach PDVH's shares.

3.      No other comparable commercial assets of Venezuela have been identified for attachment in the United States.  To deny Plaintiffs the attachment they seek—and thus the opportunity to participate in any prospective auction of PDVH shares under the auspices of this Court assuming appropriate licenses from the OFAC are received—would leave Plaintiffs without an effective remedy and work unjustifiable discrimination among Venezuela's judgment creditors, many of whom have claims dating from the identical time period when mass expropriations were a daily occurrence.

4.      Plaintiffs are in the process of applying for a license from OFAC for authorization to effectuate the attachment of the PDVH shares held by PDVSA in this District.  Plaintiffs will keep the Court advised of all developments in this regard.

## STATEMENT OF FACTS

### I.      The Arbitration Award And Judgment

On October 30, 2017, an ICSID tribunal (the "Tribunal") issued an Award in favor of Plaintiffs, finding Venezuela liable for its 2010 unlawful expropriation of Plaintiffs' investments in FertiNitro—an operation of two fertilizer plants located in Venezuela.  *Koch Minerals Sàrl v. Bolivarian Republic of Venez.*, No. 1:17-cv-2559-ZMF (D.D.C. Nov. 28, 2017), D.I. 7 ¶¶ 12–13 (Plaintiffs' Amended Complaint).  On April 11, 2018, the Tribunal effectively amended the award by issuing a Decision on Rectification, noticing and correcting an error that occurred in the calculation of the principle amount for which Venezuela was liable.  *Id.* ¶ 26.  Together, the October 30, 2017, Award and the Tribunal's April 11, 2018, Decision on Rectification thus constitute the full and final award ("Final Award") in this case.  By April of 2018, Venezuela was aware of the full extent of its liability to Plaintiffs.

In November of 2017, Plaintiffs instituted the proceedings below, filing a complaint before the District Court for the District of Columbia seeking to enforce the Final Award.  *Koch Minerals Sàrl v. Bolivarian Republic of Venez.*, No. 1:17-cv-2559-ZMF (D.D.C. Nov. 28, 2017), D.I. 1.  In May of 2018, Plaintiffs amended their complaint[3] and on March 22, 2021, Plaintiffs filed a Motion for Summary Judgment seeking a judgment to enforce the Final Award, which the Court granted on August 18, 2021.  *See* Memorandum Opinion & Order, *Koch Minerals Sàrl v. Bolivarian*

---

[3] *See Koch Minerals Sàrl v. Bolivarian Republic of Venez.*, No. 1:17-cv-2559-ZMF (D.D.C. Nov. 28, 2017), D.I. 7.

*Republic of Venez.*, No. 1:17-cv-2559-ZMF, D.I. 55 (Yanos. Decl. Ex. 3); *see also Koch Minerals Sàrl v. Bolivarian Republic of Venez.*, No. 1:17-cv-2559-ZMF, D.I. 52, 60.  The August judgments, however, contained several errors in the amount of damages awarded to Plaintiffs.  The D.C. District Court thereafter issued a corrected consolidated judgment on February 22, 2022.  *See* D.I. 1.  The same day that the D.C. District Court issued the consolidated final judgment, it also granted Plaintiffs' pending Motion for Relief Pursuant to 28 U.S.C. § 1610(c) and 28 U.S.C. § 1963, finding that: (*i*) a reasonable time had passed since the Final Judgment, warranting permission for Plaintiffs to seek Venezuela's assets found in within the United States for attachment; and (*ii*) Plaintiffs had shown good cause to register the Judgment in this District during the pendency of Venezuela's appeal.  *See Koch Minerals Sàrl v. Bolivarian Republic of Venez.*, No. 17-cv-2559-ZMF, (D.D.C. Feb. 22, 2022), D.I. 65 (Yanos Decl. Ex. 4).  Plaintiffs then registered the Judgment with this Court pursuant to 28 U.S.C. § 1963 on March 31, 2022.  *See* D.I. 1.  Since then, Venezuela has allowed the time to appeal to elapse.

## II.     This Court Found PDVSA To Be Venezuela's Alter Ego In August 2018 And Authorized Attachment Of The PDVH Shares Accordingly.

As already mentioned, Plaintiffs are not the first of Venezuela's judgment creditors to appear before this Court.  On June 19, 2017, Crystallex International Corp. ("Crystallex") registered a judgment from the United States District court for the District of Columbia based on another international arbitration award.  On August 9, 2018, this Court found that PDVSA was Venezuela's alter ego.  *See Crystallex Int'l Corp.*, 333 F. Supp. 3d at 391 (applying the test for setting aside the presumption of separateness between a State and its instrumentality set forth in *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983) ("*Bancec*")).  The record in *Crystallex* proved that the Venezuelan State exerted pervasive control over PDVSA, "including its day-to-day operations, rendering PDVSA the alter ego of

Venezuela." *Id.* at 399.  For example, Venezuela used PDVSA property for its own political purposes, deprived PDVSA of independence by appointing political figures on the company's Board of Directors, required State approval for ordinary business decisions, issued policies so that PDVSA would act directly on behalf of the State, and even tapped PDVSA for funding the fees for investor-state arbitrations.  *Id.* at 401–03.  The Court accordingly held that, Crystallex, as Venezuela's judgment creditor, could attach the PDVH shares located in this District consistent with the FSIA because they were the property of Venezuela's alter ego—and thus of Venezuela itself—used in commerce.[4]  *See id.* at 418 ("As Crystallex states, 'it is difficult to imagine property with more of a commercial use than shares of a Delaware for-profit corporation that itself owns, through an intermediate holding company, a multi-billion dollar Delaware petroleum corporation. . .'").  The Third Circuit affirmed, and the Supreme Court denied certiorari in May 2020.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126 (3d Cir. 2019), *cert. denied*, *Bolivarian Republic of Venez. v. Crystallex Int'l Corp.*, 206 L.Ed.2d 936 (2020).

## III.    Events Subsequent To This Court's August 2018 Alter Ego Decision In Crystallex.

In the months immediately following this Court's alter ego decision in *Crystallex*, the relationship between Venezuela and PDVSA continued unchanged.   The then-recognized Venezuelan government of Nicolás Maduro continued to exercise complete control over PDVSA,

---

[4] To the extent that the relationship between the Maduro regime and those parts of PDVSA that it still effectively controls remains relevant, there has been no change in the tenor of that relationship that would warrant a conclusion different from that which this Court reached in August of 2018. *See infra* at 10–11; *see also* Memorandum of Law in Support of OIEG's Motion for Reconsideration, *OI European Grp. B.V. v. Bolivarian Republic of Venez.*, No. 1:19-mc-00290 (D. Del. Dec. 23, 2019), D.I. 28 at 4–6; Memorandum of Law in Support of Plaintiff's Motion for an Order Authorizing the Issuance of a Writ of Attachment, *Rusoro Mining Limited v. Bolivarian Republic of Venez.*, 1:21-mc-00481-LPS, D.I. 4-1 at 13–22, 28–31 (Feb. 9, 2022).

among other things appointing military commanders and Venezuela's Minister of Oil to the PDVSA board by decree and subjecting the company to military control.[5]

In January of 2019, however, Venezuela's National Assembly rejected Nicolás Maduro's claim to reelection, declaring the election results illegitimate and instead named opposition leader Juan Guaidó as interim president.[6]  The United States recognized Mr. Guaidó's government as the legitimate government of Venezuela on January 23, 2019.[7]

Unable to control territory in Venezuela, Mr. Guaidó's administration has prioritized external matters, including control of overseas PDVSA entities (in particular those in the United States) and attempting to negotiate the restructuring of Venezuela's debts—including adverse arbitration awards such as the one Plaintiffs currently hold.[8]  In connection with the latter goal, Mr. Guaidó's government has, as a matter of policy, treated PDVSA's debt obligations as equivalent to those of the Venezuelan State.[9]  As part of this program, the Guaidó government in February of 2019 appointed a parallel *ad hoc* board of directors of PDVSA ("Ad Hoc PDVSA").

---

[5] *See Jiménez v. Palacios*, No. 2019-0490-KSJM, 2019 Del. Ch. LEXIS 288, at *8 n.7 (Del. Ch. Aug. 2, 2019), *aff'd,* 237 A.3d 68 (Del. July 22, 2020) (listing Mr. Maduro's October 2018 appointments).  *See also* Alexandra Ulmer & Marianna Parraga, "Oil output goes AWOL in Venezuela as soldiers run PDVSA," Reuters (Dec. 26, 2018) (Yanos Decl. Ex. 5); "Minister Quevedo Inspected Full Operability of VHICOA", Petroleos de Venezuela, S.A. (Oct. 28, 2019) (showing Mr. Quevedo as both a minister and president of PDVSA) (Yanos Decl. Ex. 6); "Venezuela names El Aissami to PDVSA board of directors," Reuters (Sept. 9, 2018) (Yanos Decl. Ex. 7); Joshua Goodman "Maduro taps US fugitive to revamp Venezuela oil industry," Associated Press (Apr. 27, 2020) (Yanos Decl. Ex. 8).

[6] *See generally* Ana Vanessa Herrero, "After U.S. Backs Juan Guaidó as Venezuela's Leader, Maduro Cuts Ties," New York Times (Jan. 23, 2019) (Yanos Decl. Ex. 9).

[7] Statement Recognizing Venezuelan National Assembly President Juan Guaidó as the Interim President of Venezuela, The White House (Jan. 23, 2019) (Yanos Decl. Ex. 10).

[8] Gomez Report, Ex. 1 ¶ 15; Gomez Report, Ex. 2 ¶¶ 19, 20.

[9] Ben Bartenstein, "U.S. Shields Citgo From Creditors in Win for Venezuela's Guaidó," Bloomberg (Oct. 24, 2019) (Yanos Decl. Ex. 11).

*See Jiménez*, 2019 Del. Ch. LEXIS 288, at *12.  As set out in Professor Manuel Gomez's expert report attached herewith,[10] it did so pursuant to an emergency "Statute to Govern the Transition Toward Democracy to Reestablish the Validity of the Constitution of the Bolivarian Republic of Venezuela" ("Transition Statute"), which "expressly bypassed the ordinary corporate regime of PDVSA."  Gomez Report, Ex. 1 ¶18.

That new government-appointed Ad Hoc PDVSA in turn appointed new directors for three Delaware entities: PDVH, Citgo Holding Inc., and Citgo Petroleum Corp.  *See Jiménez*, 2019 Del. Ch. LEXIS 288 at *33–34 (U.S. Courts must recognize Mr. Guaidó's appointed ad hoc board members as the rightful members of the boards for PDVSA, PDVH, Citgo Holding Inc., and Citgo Petroleum Corp).  Mr. Guaidó constituted Ad Hoc PDVSA with the expressed goal of "recover[ing] and protect[ing] the nation's assets abroad."[11]  To date, the *ad hoc* board extensively controls elements of PDVSA and its assets located outside the physical territory of Venezuela and regularly reports its operations to the National Assembly.  *Id.*[12]  Indeed, the Transition Statute

---

[10] Professor Gomez's expert report ("Gomez Report") filed in support of Plaintiffs' Motion attaches and incorporates by reference two past reports he drafted in the parallel proceeding *Northrop Grumman Ship Systems, Inc. v. Ministry of Defense of the Bolivarian Republic of Venezuela*, No. 1:20-mc-257 (D. Del. Feb. 19, 2021).  Professor Gomez's opening and rebuttal reports are attached to his current expert report as Exhibit 1 ("Gomez Report, Ex. 1") and Exhibit 2 ("Gomez Report, Ex. 2") respectively.  Professor Gomez's reports show that recognition of Mr. Guaidó as Venezuela's Interim President does not change PDVSA's alter ego status.  As Mr. Gomez concludes in the current report, he "still opine[s] that the circumstances considered by this Court back in 2018 regarding PDVSA's status as Venezuela's alter ego, and the reasons expounded in my two reports submitted to this Court and explained during my appearance in April 2021, have not changed."  Gomez Report ¶ 19.

[11] "Guaidó on recovered assets: 'Our commitment is to Venezuelans and transparency,'" República Bolivariana de Venezuela, Asamblea Nacional, CENTRO DE COMUNICACIÓN NACIONAL (Aug. 7, 2020) (Yanos Decl. Ex. 12).

[12] *See also* certified translation of Leonardo García, "Junta Ad Hoc de Pdvsa emitió 40 reportes y 114 observaciones en rendición de cuentas ante AN/2015," NOTICIERO DIGITAL (July 23, 2021), (Yanos Decl. Ex. 26) (detailing recent reports to the National Assembly).

contemplated Ad Hoc PDVSA's role as a political tool from the start.  Article 34(3)(b) of the original Transition Statute expressly prohibited PDVH and its subsidiaries from forming "any relationship" with the Maduro regime and from making payments or distribution to PDVSA. Gomez Report, Ex. 2 ¶ 17.  And Article 36 of the original Transition Statute, precluded the disposal of any funds belonging to PDVSA or any other state-owned entity without express authorization from the National Assembly until after the Maduro regime relinquishes power.  *See* Gomez Report, Ex. 1 ¶ 22.

Maduro's ruling party has taken control of the National Assembly in Venezuela after elections held late last year.[13]  Nonetheless, Venezuela's Opposition Party extended the ruling authority of the 2015 iteration of the National Assembly, which the United States "continues to recognize,"[14] and amended the Transition Statute in January of 2022.[15]  To be sure: Mr. Guaidó "and an opposition commission drawn from those elected to parliament in 2015, who enacted reforms to extend their own mandate, continue to control Venezuela's assets abroad, such as U.S. oil refiner Citgo and Colombian fertilizer manufacturer, Monomeros."[16]  As explained in Professor Gomez's report, Mr. Guaidó's current threatened political stance has only ***increased*** his grip on PDVSA and its assets.  Indeed, Mr. Guaidó's own cabinet members, political allies and the

---

[13] *See* Deisy Buitrago & Mayela Armas, "Venezuela opposition must recognize errors to resume dialogue-gov't," REUTERS (Jan. 5, 2022) (Yanos Decl. Ex. 43).

[14] *See* "U.S. Recognition of Venezuela's 2015 National Assembly and Interim President Guaidó," U.S. Dept. of State (Jan. 4, 2022) (Yanos Decl. Ex. 27).

[15] Gomez Report ¶ 10.  None of the 2022 amendments to the Transition Statute have had the effect of loosening the Guaidó administration's grip over PDVSA.  *Id.* ¶ 11.  For example, Article 38 of the amended statute maintains the prohibition of any ad-hoc boards disposing or liquidating any State asset until "until free, fair and verifiable presidential and parliamentary elections are held." *Id.* at 11.

[16] Yanos Decl. Ex. 43; *see also* 2021 CITGO Annual Report at 5 (Yanos Decl. Ex. 19) (showing CITGO ultimately owed by PDVSA ad hoc board).

Supreme Justice Tribunal in Exile have all expressed concern over Mr. Guaidó's "lack of transparency, accountability, and overt politization in the management of Venezuela's assets located abroad." Gomez Report ¶ 5.

In December 2021, Mr. Guaidó's Commissioner of Foreign Affairs, Julio Borges, resigned due to his belief that "the interim administration has lost its way and become a corrupt bureaucracy." *Id.* ¶ 7. As Professor Gomez reports, Mr. Borges accused "Guaidó of managing [PDVSA] by only following his political-party line and of allocating management positions based on political commitments." *Id.* Primero Justicia, one of the political parties that formed Mr. Guaidó's original coalition, issued a statement in September of 2021 "declaring its disagreement with the management of Venezuela's foreign assets by the Guaidó administration." *Id.* ¶ 9. In July of 2022, Primero Justicia "vowed to formally request the Delegate Commission of the National Assembly to hold Guaidó accountable, and to demand 'transparency in the management of assets.'" *Id.* ¶ 12.[17] That same month, the Constitutional Chamber of the Supreme Justice Tribunal in Exile issued an order to the National Assembly, the Commission of Finances, and the Special Comptroller and the Commission for the Management of Expenditures created by the Special Act of the Fund for the Liberation of Venezuela and Management of Vital Risky Cases, to "inform the Court whether Interim President Guaidó has fulfilled his constitutional mandate to inform the National Assembly about his performance since his investiture as Interim President of Venezuela." *Id.* ¶ 16.

While Mr. Guaidó continues to vie for political legitimacy through the Ad Hoc PDVSA, Mr. Maduro has managed to hold onto those other elements of PDVSA still present in Venezuela.

---

[17] (quoting Primero Justicia, Primero Justicia volverá a exigir ante la AN-2015 transparencia en el manejo de activos, TAL CUAL DIGITAL (July 24, 2022), https://talcualdigital.com/pj-exigira-a-la-an-de-2015-transparencia-en-el-manejo-de-activos/).

To be sure: Mr. Maduro's actions have not worked to lessen his purported government's extensive control over the PDVSA assets still located in Venezuela.[18]   To date, Maduro has continued to appoint political allies on PDVSA's Board of Directors, including Asdrúbal José Chávez Jiménez—cousin of the late Hugo Chávez.[19]   Furthermore, the Minister of Petroleum, Tareck El Assami, continues to represent the Republic at shareholder meetings.  *Id.*[20]  El Assami is currently wanted by the United States for narcotic trafficking.[21]

## ARGUMENT

Section 1610(a)(6) of the FSIA provides that a foreign State's property used for commercial activity in the United States may be attached in aid of execution of a judgment based on an order confirming an arbitral award rendered against the foreign state.  *See* 28 U.S.C. § 1610(a)(6).  Plaintiffs registered a judgment in this District from a United States court confirming an arbitral award rendered against Venezuela.  *See* D.I. 1.  Venezuela, through its alter ego PDVSA, owns shares in PDVH located in this District and exercises its ownership of those shares in commerce.  As such, Venezuela's shares in PDVH are not immune to a writ of attachment for the fulfillment of the Final Award.

---

[18] While the United States recognizes the Guaidó administration as the Venezuelan State, some levels of diplomatic talks have occurred between the United States and the Maduro regime in 2022.  *See* Marianna Parraga, et al., "UPDATE 2-U.S., Venezuela discuss easing of sanctions, make little progress -sources," REUTERS (Mar. 6, 2022) ("A U.S. delegation led by Juan Gonzalez - the top White House Latin America adviser - and Ambassador James Story held talks at the Miraflores palace with socialist President Nicolas Maduro and his Vice President, Delcy Rodriguez") (Yanos Decl. Ex. 40).  If the United States were to make a shift in policy in the coming months to recognize the Maduro regime, it would not affect PDVSA's alter ego status.

[19] "Corporate Governance," Petroleos de Venezuela, S.A. (PVDSA.com) (Yanos Decl. Ex. 39).

[20] *See also* Deisy Buitrago & Marianna Parraga, "EXCLUSIVE Venezuela's Maduro plans to replace Oil Minister El Aissami -sources," REUTERS (Dec. 9, 2021) (Yanos Dec. Ex. 41) (reporting that Mr. Chavez may soon replace Mr. Aissami as Oil Minister).

[21] "Tareck Zaidan El Aissami Maddah– New Target," U.S. Dept. of State (Mar. 26, 2020) (Yanos Decl. Ex. 32).

I.      **The Court Should Give Collateral Estoppel Effect to its 2018 Alter Ego Finding Since Venezuela Incurred Liability at that Time.**

The alter ego doctrine "applies when there is such unity between a corporation and an individual that separateness of the corporation has ceased."  William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.25 (2002).  When one entity is an alter ego of the other, both are legally one in the same.  *See*, *e.g.*, *Patin v. Thoroughbred Power Boats, Inc*., 294 F.3d 640, 654 (5th Cir. 2002) (alter egos "are considered to be one and the same under the law").  A party can collect from one off the basis of the other's liability because the property of one is the property of the other.  To be sure: this doctrine is exceptional.  The alter ego doctrine is a highly flexible, fact-specific "tool of equity."  *Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 193 n.6 (3d Cir. 2003) (quoting *Pearson v. Component Tech. Corp*., 247 F.3d 471, 484 (3d Cir. 2001)) ("*Lutyk*"); *see also Trs. of the N.Y.C. Dist. Council of Carpenters Pension Fund v. B&L Moving & Installation, Inc.*, No. 16-CV-4734 (GBD) (JLC), 2017 U.S. Dist. LEXIS 157756, at *8 (S.D.N.Y. Sep. 26, 2017) (stating that the alter ego doctrine is "a 'flexible' test that weighs the circumstances of each case.").  As such, "piercing the corporate veil is not technically a mechanism for imposing 'legal' liability, but for remedying the 'fundamental unfairness [that] will result from a failure to disregard the corporate form.'"  *Lutyk*, 332 F.3d at 193 n.6 (quoting Fletcher Cyclopedia of the Law of Private Corporations § 41.25).

A.      **The Court's Prior Decision Finding that the "Pertinent Time" for the Alter Ego Analysis Was the Time of Filing the Writ Was Incorrect and Inequitable.**

The Court's prior decision to limit this analysis to the time between the filing and the eventual issuance of a writ of attachment misunderstands the underlying purpose of the alter ego doctrine, producing ***inequitable*** results.  Once an award is issued, the award recipient becomes an award creditor and the losing party becomes the award debtor.  If, at that moment, the award debtor

is the alter ego of another party, then by definition that other party is also an award debtor to the award creditor. It should therefore be impossible for the alter ego award debtor to extinguish its debt except by one of the following methods: (1) payment of the debt; (2) assignment of the debt with the creditor's consent; or (3) legal extinction of the award. Here, none of these scenarios have occurred.

The Court's prior position is also inequitable for two reasons:

*First*, the Court's alter ego analysis has created a vast difference between Plaintiffs' and Crystallex's claim to PDVSA's shares in PDVH. Crystallex enjoys the assurance of eventually collecting PDVSA stock in PDVH no matter what facts develop tomorrow. In stark contrast, the Court has required recent judgment creditors to navigate a legal limbo, forcing them to relitigate the alter ego question based on what new facts appear each day while waiting for a writ of attachment even though the Court found that PDVSA and Venezuela were one-in-the-same during when Plaintiffs received their Final Award in April of 2018. As of that date, the extent of Venezuela's liability toward Plaintiffs was finalized and a nickel in PDVSA's vault was indeed Venezuela's nickel. Therefore, the *Crystallex* alter ego determination of PDVSA's status as an alter ego, and the liability that follows with that status, was also defined in regard to Plaintiffs. As of 2018, Plaintiffs were entitled to collect $306.95 million plus costs and interest from either Venezuela or PDVSA. The only difference between Crystallex and Plaintiffs was that Plaintiffs still had to domesticate its Final Award before seeking an enforcement action. But that should have no impact on Plaintiffs' entitlement to collect from Venezuela's alter ego. This process did

13

not change or alter Venezuela's (and therefore PDVSA's) liability.  It merely stamped the United States' seal of legitimacy.[22]

*Second*, the Court's pertinent time decision would encourage award debtors to take actions designed to allow them to become judgment proof after a court's final order but before the granting of a writ during execution proceedings.  This cannot be the result of a doctrine rooted in equity with the goal of preventing the "fundamental unfairness" resulting from the abuse of the corporate form.  *Lutyk*, 332 F.3d at 193 n.6.  This Court has already acknowledged the reality of its decision. In denying Venezuela's request to reconsider the 2018 alter ego findings due to facts that have since developed, the Court stated that, "[b]efore the Court granted Crystallex's motion for a writ, PDVSA was free to alienate its shares of PDVH."  *Crystallex Int'l Corp.*, 2021 U.S. Dist. LEXIS 7793, at *19.  Yet since the issuance of the writ in Crystallex's favor, "the shares were attached; that is, they were (and remain) restricted from alienation by operation of the [District] Court's order."  *Id.*

The Court's holding conflicts with *Bancec*, where the Court analyzed the alter ego relationship between Cuba and Bancec, an entity Cuba set up as "an autonomous credit institution."  *Bancec*, 462 U.S. at 613.  There, Bancec first brought suit to collect on letters of credit, which Citibank counterclaimed to set off the owed amount by the value of its assets the Cuban government nationalized.  *Id.*  After filing the complaint, ***but before Citibank counter claimed***, Cuba dissolved Bancec and distributed its assets among other entities, including the

---

[22] It is axiomatic that Congress intended the enforcement of an international arbitration award to be a summary, deferential process.  *See* 9 U.S.C. § 302 (incorporating by reference 9 U.S.C. § 207); Inter-American Convention on International Commercial Arbitration, 1438 U.N.T.S. 245 (1975) ("Panama Convention"), Art. V; *Gulf Petro Trading Co. v. Nigerian Nat'l Petro. Corp.*, 512 F.3d 742, 747 (5th Cir. 2008) (stating that "secondary jurisdiction courts may only refuse or stay enforcement of an award on the limited grounds specified in Articles V and VI" of the Convention).

national bank.  *Id.* at 615.  Nonetheless, the Supreme Court analyzed the relationship between

Cuba and the dissolved entity:

> Giving effect to Bancec's separate juridical status in these circumstances, even
> though it has long been dissolved, would permit the real beneficiary of such an
> action, the Government of the Republic of Cuba, to obtain relief in our courts that
> it could not obtain in its own right without waiving its sovereign immunity and
> answering for the seizure of Citibank's assets -- a seizure previously held by the
> Court of Appeals to have violated international law.  We decline to adhere blindly
> to the corporate form where doing so would cause such an injustice.

*Id.* at 632.  Directly counter to the Court's 2019 decision denying collateral estoppel effect of its

previous alter ego finding, the Supreme Court in *Bancec* firmly stated that "Cuba cannot escape

liability for acts in violation of international law simply by retransferring the assets to separate

juridical entities."  *Id.* at 633.  "To hold otherwise would permit governments to avoid the

requirements of international law simply by creating juridical entities whenever the need arises."

*Id.*

Equity and fundamental fairness are the north star to a court's alter ego inquiry, but the

Court has yet to apply these principles to judgement creditors since its initial alter ego finding.

The Court's assessment of alter egos between the time of filing and the eventual issuance of a writ

of attachment frustrates the equitable and flexible nature of the doctrine.

    **B.**    **The Proper Time to Assess Alter Ego Liability is at the Time the Principal**
            **Debtor Incurred Liability.**

The Court should assess PDVSA's alter ego liability at the time that the principal debtor

incurred liability.  This is no foreign concept; other courts have held the same.  *See Lutyk*, 332 F.3d

at 193 n.6 ("Alter ego status is determined by conduct of the parties that is material to the dispute

at hand. . . thus, the theory of harm alleged may affect the scope of the remedy that equity

demands."); *Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 140 F.

Supp. 2d 447, 457 (E.D. Pa. 2001), *aff'd sub nom*., *Trs. of Nat'l Elevator Indus. Pension, Health*

*Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188 (3d Cir. 2003) ("Here, the relevant time period is

the time at which the corporation incurred liability"); *Equal Rights Ctr. v. Equity Residential*, No.

CCB-06-1060, 2016 U.S. Dist. LEXIS 44027, at *16 (D. Md. Mar. 31, 2016) (noting that

"traditional veil piercing analysis . . . focuses on the parent-subsidiary relationship at the time of

the events giving rise to the liability."); *Chicago Florsheim Shoe v. Cluett, Peabody & Co*., 826

F.2d 725 (7th Cir. 1987) (analyzing alter ego status at the time liability arose); *Connors v. Peles*,

724 F. Supp. 1538, 1560 (W.D. Pa. 1989) (alter ego analysis under ERISA at time of the

withdrawal occurred).[23]

      Applying this theory to the facts at hand, a claim to an enforcement action accrues from

the refusal to pay the underlying debt—here, the 2018 Final Award.[24]  *See City of Almaty v.*

*Ablyazov*, No. 15-CV-5345 (ASN), 2019 U.S. Dist. LEXIS 55183, at *26 (S.D.N.Y. Mar. 29,

2019) ("[A]n alter ego and its principal are treated as one entity for purposes of claim accrual.")

(quotation marks omitted); *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc*., 608 F.

Supp. 1261, 1264 (S.D.N.Y. 1985) ("The action accrued against both the corporation and any alter

egos when the judgment was entered.").  That is the nature of these proceedings.  Plaintiffs would

not have a claim if Venezuela paid the amount it was found liable of in 2018.  There would be no

case in controversy remaining.  But Venezuela did not pay in 2018.  Plaintiffs' enforcement claim

---

[23] The same is true under states' alter ego analyses.  *See*, *e.g.*, *Kessinger v. Gen. Mining Union Corp*., No. 85-3092, 1986 U.S. Dist. LEXIS 31038, at *13 (C.D. Ill. Mar. 26, 1986) ("Under Illinois law, a cause of action accrues when a plaintiff's injury becomes manifest, and therefore plaintiffs here need prove only that an alter ego relationship existed between Charter and Cape at that time."); *In re Wolf*, 595 B.R. 735, 769-70 (Bankr. N.D. Ill. 2018) (analyzing Delaware and Illinois law, finding that two entities were to be treated as one "legal personality during the period of time over which [one] corporation was used to further [another party's] allegedly fraudulent scheme.").

[24] Although Venezuela later sought to annul the Final Award, that event failed to reverse the underlying findings of liability in the 2018 Final Award.

against Venezuela thereby accrued and it was forced to begin the collection process by turning to the United States judicial system that housed Venezuela's assets in PDVSA.

Following this approach to the alter ego analysis would take a firm stand consistent with *Bancec* that award debtors cannot shed their assets after realizing the extent of their liability. Again, the facts of this case provide a clear illustration. Venezuela's debt to Plaintiffs accrued in 2018—just months before the Court's holding that PDVSA was the alter ego of Venezuela based on facts dating back to 2002. *See Crystallex Int'l Corp. v. Bolivarian Rep. of Venez.*, 333 F. Supp. 3d at 406–011 (analyzing facts spanning 2002-18). The Third Circuit affirmed that ruling based on the same relevant timeline. *See Crystallex Int'l Corp.*, 932 F.3d at 146 (assessing events "since 2002"); *id.* at 146 (assessing "bondholder disclosures [of State control] in 2011 and 2016"); *id.* at 148 (assessing events in 2014 and 2016). It follows that the Court should find that PDVSA remains liable to Plaintiffs to date. If a defendant was found liable and maintained an alter ego at the time of the judgment, then immediately changed how it governed that entity before the time of executing the judgment, it would be inequitable to allow the defendant to seek protection of the corporate form at the eleventh hour. This is especially true where the defendant, like Venezuela with regard to PDVSA, did not sell its controlling stake in the alter ego.

Support for assessing alter ego status at the time liability is finalized in a judgment or award can be found in the reverse situation, where courts have imposed liability upon alter egos for events that ***precede*** their existence. *See Trs. of the Heating, Piping & Refrigeration Pension Fund v. Conditioned Air Sys.*, No. CCB-12-604, 2014 U.S. Dist. LEXIS 41981, at *19 (D. Md. Mar. 28, 2014) ("The creation of a new entity just as Systems was facing increasing liability with respect to its contributions to the 602 Funds indicates alter ego status."). Courts have not allowed judgment debtors to shield their assets in the eleventh hour by creating a new corporation. It

follows that courts should also forbid a judgment creditor from protecting its assets by suddenly recognizing corporate formalities at the eleventh hour.

Because the Court's 2018 *Crystallex* decision encompassed the relevant time period for the alter ego analysis as it relates to Venezuela's liability to Plaintiffs, the Court should give that order the effect of collateral estoppel.

**II.   Alternatively, A Writ Of Attachment Against PDVH Shares Owned By PDVSA Is Appropriate Because PDVSA Remains Venezuela's Alter Ego Under The Guaidó Government.**

**A.   The *Crystallex* Alter Ego Decision Should Have The Effect Of Collateral Estoppel, At Least Through August 2018.**

Even if the Court were to decline to revisit its prior timeline for the alter ego analysis, it should find the 2018 *Crystallex* decision **at least** determinative of PDVSA's alter ego status up to August of 2018.  *Cf. Crystallex*, 2019 U.S. Dist. LEXIS 214167, at *23 ("[A]ny creditor may be able to find support (perhaps strong support) in the record created in the Crystallex Asset Proceeding and the finding reached (and affirmed) [there]").  The Court should therefore incorporate the facts of that case into this matter and compare any events (or lack thereof) subsequent to 2018 to Venezuela's long history of extensively controlling PDVSA as its alter ego. *See Crystallex Int'l Corp.*, 2021 U.S. Dist. LEXIS 7793, at *19 n.4 ("Historical facts could have an impact, even a substantial or perhaps dispositive impact, on assessing (for example) whether an

alter ego relationship exists in the pertinent period.").  Indeed, courts have often applied collateral estoppel to litigated issues specific to certain time frames.[25]

### B.    Events Subsequent To The Court's August 2018 Alter Ego Finding Do Not Change The Fact That PDVSA Is The Alter Ego Of The Venezuelan State.

Events subsequent to the *Crystallex* alter ego finding—particularly to the impact of the United States' recognition of Mr. Guaidó's government—do not alter PDVSA's status as the alter ego of Venezuela.  To be sure, Venezuela continues to exert extensive control over PDVSA to this day.  *See Bancec*, 462 U.S. at 629 ("[W]here a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, . . . one may be held liable for the actions of the other).

As a preliminary matter, between August 2018 and January 2019, the United States continued to recognize Mr. Maduro as the legitimate president of Venezuela.  During this time, the Maduro regime's treatment of PDVSA as coterminous with the Venezuelan State continued unmistakably and unabated.  For example, in October of 2018, Maduro named General Manuel Salvador Quevedo Fernández, a career military officer and then-Minister of Oil as president of the board of PDVSA and Tareck El Aissami, the then Minister of Industry and National Production, as External Director of PDVSA.  *Jiménez*, 2019 Del. Ch. LEXIS 288, at *8 n.7.[26]  In the later part

---

[25] *See, e.g.*, *Bradburn Parent Teacher Store, Inc. v. 3M*, No. 02-7676, 2005 U.S. Dist. LEXIS 5315, at *20 (E.D. Pa. Mar. 30, 2005) ("[F]or the period from June 11, 1993 through October 13, 1999, the issues for which Bradburn seeks collateral estoppel in this case are the same as those before the jury in [another proceeding]. Accordingly, the Court finds that all five issues Bradburn seeks to preclude satisfy the first element for the application of collateral estoppel for the time period from June 11, 1993 through October 13, 1999."); *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 553 F. Supp. 962, 966 (N.D. Ill. 1982) ("Because [another proceeding's] findings relevant here are focused on the 1970-71 period, any collateral estoppel effect must be so limited.").

[26] *See also supra* at 10–11.  As noted above, Tareck El Aissamia—a wanted criminal—is now Minister of Petroleum.  Of note, El Aissami is wanted by the United States as a narcotics trafficker. *Id.*

of 2018, Mr. Quevedo imposed a military regime on PDVSA, arresting workers for operational mistakes and deploying active military personnel aboard tankers.[27]  In short, the attitude of the Maduro regime towards PDVSA during this period was no different than prior to this Court's alter ego decision in *Crystallex*, and there is no reason to imagine that this Court's decision would have been different had it come a few months later.

Thereafter, neither the United States' recognition of Mr. Guaidó as interim president in January of 2019, nor the attitude of his government toward PDVSA and its United States entities, warrant a change from this Court's finding that PDVSA is the Venezuelan State's alter ego.

### 1.    *PDVSA Is Controlled Absolutely For Political Purposes By The Guaidó Government.*

To begin with, Mr. Guaidó's administration has continued the government tradition of appointing PDVSA board positions.  On February 8, 2019, within in a month of declaring himself interim president on January 23, 2019, Mr. Guaidó consolidated power by appointing a new, *ad hoc* board of directors to PDVSA pursuant to extraordinary powers granted to him by Venezuela's National Assembly under the Transition Statute.  *See Jiménez*, 2019 Del. Ch. LEXIS 288, at \*12; Gomez Report, Ex. 1 ¶¶ 18–19.  The *ad hoc* board has since acted as an extension of the political will of the Guaidó administration and a valuable political bargaining chip to leverage legitimacy over the former Maduro regime.[28]  To date, President Guaidó's administration has appointed only board members sympathetic to its political ends.  For example, in June of 2021, President Guaidó's *ad hoc* board appointed five new candidates for the boards overseeing Citgo—all "tied to different

---

[27] Yanos Decl. Ex. 5.

[28] *See* "Venezuela's Maduro says Citgo is key point in opposition dialogue," REUTERS (May 14, 2021) (Yanos Decl. Ex. 30) ("Venezuelan President Nicolas Maduro said the opposition's continued control of Venezuelan-owned U.S. refiner Citgo would be a key point in any eventual dialogue with opponents to resolve the country's longstanding political crisis.").

Venezuelan opposition parties."[29]  All candidates were approved by the National Assembly itself. *Id.*  These appointments were made as the National Assembly steered its influence over the Venezuelan assets, seeking, among other things, Citgo's payment of dividends to PDVH, of which PDVSA—and by extension, Venezuela—owns all stakes.  *Id.*[30]

Venezuela's control extends beyond the appointment of Citgo and PDVH board members. As discussed in more detail below, the Guaidó administration has directly involved itself in litigation surrounding the PDVSA bonds leveraging Citgo.[31]  Furthermore, PDVSA regularly presents its activities before the National Assembly.[32]  For example, in August of 2020, the Guaidó-appointed President of the *ad hoc* PDVSA board reported to the National Assembly's permanent committees on Energy and Petroleum, Finance and Economic Development, and Comptrollership.[33]  During that report, which was broadcast live to all Venezuelans, Mr. Pacheco

---

[29] *See* "Venezuelan opposition reshuffles boards overseeing U.S. refiner Citgo," REUTERS (June 1, 2021) (Yanos Decl. Ex. 31); "Luis Giusti ousted from Citgo Petroleum's board of directors," REUTERS (Apr. 11, 2022) (Yanos Decl. Ex. 42).

[30] The 2022 amended Transitional Statute formalizes the National Assembly's role in the appointment of PDVSA board members.  Gomez Report ¶ 10.  Venezuela has therefore only drawn PDVSA closer to the State.  Mr. Guaidó is president of the National Assembly, (*id.*), and members of the political party, Primero Justicia, continue to have concerns into 2022 as to whether the Guaidó administration "treats PDVSA and Venezuela as one and the same" for a political advantage.  *Id.* ¶ 12.

[31] "U.S. Treasury Department Extends Protection to Citgo from PDVSA 2020 Bonds (Press Release)," Republica Bolivariana de Venezuela, Asamblea Nacional, CENTRO DE COMUNICACIÓN NACIONAL (July 15, 2020) (Yanos Decl. Ex. 20) (noting that both the Office of the Special Prosecutor, as well as the Venezuelan Embassy in the United States, have taken action to invalidate PDVSA bonds initially negotiated by the Maduro regime).

[32] *See* Yanos Decl. Ex. 26 (stating that the Ad Hoc Board "issued 40 reports and 114 observations this Friday on rendering accounts before the [National Assembly] . . . and they reiterate that they seek to 'protect and defend' PDVSA assets overseas.").

[33] "PDVSA's ad hoc Board of Directors highlights the transparent management of its subsidiaries in the U.S.," Republica Bolivariana de Venezuela, Asamblea Nacional, CENTRO DE COMUNICACIÓN NACIONAL (Aug. 5, 2020) (Yanos Decl. Ex. 17).

announced that the *ad hoc* board appointed by President Guaidó had taken "**total control**" of PDV Holding, Inc., CITGO Holding, Inc, and CITGO Petroleum Corporation.  *Id.* (emphasis added).  In fact, the National Assembly website frequently updates the status of both PDVSA and its subsidiary, CITGO.[34]

### 2.    The Guaidó Government uses PDVSA as the government's asset.

Mr. Guaidó's government does not actually have the physical ability to control as much of PDVSA within Venezuela as Mr. Maduro's purported government.  That said, following Mr. Guaidó's rise as president, his government has continued to identify PDVSA as part and parcel of the Venezuelan State.  *See Crystallex*, 333 F. Supp. 3d at 401 (determining extensive control in part on when a sovereign "uses the instrumentality's property as its own").  For example, Mr. Guaidó's administration characterized the appointment of an *ad hoc* board as part of "taking progressive and orderly control of the **assets of our Republic abroad**" in order to "speed up the political transition."[35]  Further, in a statement on the National Assembly website, Mr. Guaidó's government describes CITGO (which is a subsidiary of PDVH) as "**one of the most valuable assets of the nation**."[36]  If CITGO is an "asset of the nation," it follows that the shares of its Delaware parent company must be as well.  Similarly, a statement by Venezuela's ambassador to the United States posted on the National Assembly website described U.S. Treasury regulations that, in Venezuela's view, work to shield against attachment of CITGO assets as a diplomatic "achievement of the

---

[34] *See, e.g.*, Yanos Decl. Exs. 12, 15, 17, 20, 21, 22.

[35] Renzo Pipoli, "Venezuela's Guaidó to name new boards of PDVSA and Citgo," UPI (Jan. 29, 2019) (emphasis added) (Yanos Decl. Ex. 14); *see also* Yanos Decl. Ex. 19 at 5 ("We take seriously our responsibility to CITGO's ultimate shareholder, the Venezuelan nation.").

[36] Yanos Decl. Ex. 12 (emphasis added).

interim government of President Juan Guaidó to permanently secure the **assets of the Venezuelan state**."[37]  Plaintiffs, of course, are judgment creditors "of the Venezuelan State."

Mr. Guaidó's approach to restructuring Venezuela's debt further confirms his government's identification of PDVSA with the State.  In this crucial context, Mr. Guaidó's government makes no meaningful distinction between the assets and liabilities of the Venezuelan State and those of PDVSA.  Instead, Mr. Guaidó's government has called for "equal treatment" of all claims subject to renegotiation, no matter "the identity of the public sector obligor."[38]  In its position on renegotiation of Venezuela's sovereign debt, Mr. Guaidó's government defines "public sector obligor" as "the Republic, PDVSA or another public sector entity."  *Id.*

Mr. Guaidó's government went so far as to litigate for the invalidation of bonds issued by Mr. Maduro's government in the Southern District of New York.  In doing so, PDVSA itself has emphasized the control of the government over its operations and defined its constitutional role to "manage the [Venezuelan] oil industry," including CITGO—the "'crown jewel' and most economically and strategically important foreign asset of national [Venezeulan] public interest." *See* PDVSA Memorandum of Law in Support of Motion for Summary Judgment, *Petroleos De Venez. S.A. et al v. MUFG Union Bank, N.A. et al*, No. 1:19-cv-10023 (S.D.N.Y. June 15, 2020), D.I. 117, at 31 (Yanos Decl. Ex. 16); *Id.* at 30 n. 84 (stating that "[t]here is no dispute that PDVSA and PDVSA Petróleo, which are 'attached' to (and thus controlled by) Venezuela's Ministry of

---

[37] "Venezuelan Interim Government Achieves Strengthening of U.S. Treasury Measures for the Protection of CITGO and Other Assets," Republica Bolivariana de Venezuela, Asamblea Nacional, CENTRO DE COMUNICACIÓN NACIONAL (Nov. 20, 2019) (emphasis added) (Yanos Decl. Ex. 15).

[38] "Guidelines for the Renegotiation of the Chavez/Maduro Era Legacy Public External Debt, Office of the Special Attorney General of the Bolivarian Republic of Venezuela," Asamblea Nacional (July 1, 2019) (Yanos Decl. Ex. 13).

Petroleum and Mining, are part of the National Public Administration of the Venezuelan Republic").[39]

> **3.** ***Consistent with its domination of PDVSA for political ends, the Guaidó Government requires the instrumentality to obtain approvals for ordinary business decisions from a political actor.***

The Guaidó administration's policy of "total control" over PDVSA is reflected in the Transition Statute.  As Professor Gomez explained in his first report, Article 34 of the original Transition Statute expressly bypasses the ordinary corporate regime of PDVSA in order to empower Mr. Guaidó to appoint a special Board of Directors for PDVSA for the explicit purpose of allowing it to exercise its rights as PDV Holding's shareholder, including the selection of board members to PDV Holding, Citgo, and other affiliates.  Gomez Report, Ex. 1 ¶¶ 18, 21.  Article 36 of the amended Transitional Statute now increases the role of the National Assembly in that process.  Gomez Report ¶ 10.  Further, on April 2, 2019, the National Assembly enacted an "Accord to Expand the Powers Vested and the Number of Ad-Hoc Board Members of PDVSA" that further expanded Mr. Guaidó's controls over PDVSA by allowing him to expand the authority of PDVSA's board by special decree, and by suspending all rights and authorities otherwise vested in PDVSA's the Shareholders' Meeting, the Board of Directors, and the Presidency of PDVSA

---

[39] *See also* Yanos Decl. Ex. 26 ("Juan Guaidó, said that 'I appreciate the work of the members of the boards of directors and their commitment to the country, because despite the threats and persecution by the regime, they manage to preserve the interests of the nation.'"); "NY District Court responds favorably to the appeal of the Interim Government with a ruling that prevents holders of the PDVSA 2020 Bond from acting against CITGO's Assets," Republica Bolivariana de Venezuela, Asamblea Nacional, CENTRO DE COMUNICACIÓN NACIONAL (Dec. 29, 2020) (Yanos Decl Ex. 21) (Venezuelan Ambassador Carlos Vecchio stated, "It is clear that we have done and will continue to do EVERYTHING to protect and preserve Citgo for Venezuelans."); "President (e) Guaidó after court ruling on PDVSA 2020 bonds: 'CITGO remains protected,'" Republica Bolivariana de Venezuela, Asamblea Nacional, CENTRO DE COMUNICACIÓN NACIONAL (Oct. 17, 2019) (Yanos Decl Ex. 22) (Mr. Guaidó referring to the protection of Citgo as the protection of "the country's assets").

and its affiliates.  *See* Gomez Report, Ex. 1 ¶ 20.  This law also suspended any functions given to the Minister of Hydrocarbons and any other government official, branch or agency related to PDVSA, which existed by or was given any functions after January 10, 2019, replacing the previous legal framework for PDVSA's governance with "total control" of Mr. Guaidó's government.[40]

Under this new legal framework, it is the position of the Guaidó administration that every PDVSA contract with a foreign national must be approved by the legislature consistent with Article 36 of the original Transition Statute, which precludes the disposal of any funds belonging to PDVSA or any other state-owned entity without express authorization from the National Assembly until after the Maduro regime relinquishes power.  *See* Gomez Report, Ex. 1 ¶ 22.  A similar prohibition is found in Article 38 of the amended Transitional Statute.  Gomez Report ¶ 11.  Even to be able to carry out an otherwise ordinary business decision such as paying its own legal fees, PDVSA had to obtain express authorization from Guaidó's National Assembly in 2019.[41]  The Guaidó administration took the same stance when it objected to the Maduro administration's sale of PDVSA stake in Swedish refiner, Nynas AB, with the National Assembly's energy committee considering the deal null, "as it was not approved by congress."[42]

---

[40] *See, e.g.*, Yanos Decl. Exs. 12, 15, 17, 20, 21, 22.

[41] *See* Gomez Report, Ex. 1 ¶ 22; Agreement Authorizing Use of Resources of PDVSA to Defend Assets Abroad (Yanos Decl. Ex. 29) (authorizing PDVSA to use funds "exclusively to pay the professional fees required to meet the most urgent and priority needs associated with the judicial and out-of-court defense of its assets"); *see also* Yanos Decl. Ex. 26 (the National Communication Center stating that "[t]he objective of the Ad Hoc Board is to protect and defend the assets of PDVSA overseas. They had the *support of the Special Prosecutor's Office of the Republic* and possible steps were anticipated to get resources in order to implement the defense of the assets") (emphasis added).

[42] Luc Cohen, "Venezuela's Congress to voice concern to U.S. over Nynas sanctions removal," REUTERS (May 14, 2020) (Yanos Decl. Ex. 23).

*See also* Yanos Decl. Ex. 16 at 30 (seeking to avoid obligations to PDVSA bondholders by arguing that all of PDVSA's contracts required prior approval by Venezuela's National Assembly).   In short, the Venezuelan State's position is that PDVSA's borrowing is the State's borrowing, and its business decisions are likewise those of the Venezuelan State.   This is precisely the kind of extensive control contemplated by the Supreme Court in *Bancec* and, though played in a different key by a new government, that was the foundation for this Court's earlier alter ego finding.   *See Crystallex*, 333 F. Supp. 3d at 406–12.

### 4.    The Guaidó Government ignores the instrumentality's separate status or ordinary corporate formalities and causes it to act directly at the instruction of the State.

Through the framework of the Transition Statute, the Guaidó administration has not only continued the sublimation of PDVSA into the State, but formally intensified it.   As Professor Gomez explains, Article 34 of the Transition Statute originally *bypassed* the ordinary corporate regime of PDVSA specifically in order to allow Mr. Guaidó's handpicked board of PDVSA directors to exercise control over PDV Holdings, while overriding all other potentially applicable provisions of Venezuelan law, such that Mr. Guaidó and his appointees have, as a matter of law, been given unfettered authority over control over PDVSA and PDV Holding.   *See* Gomez Report, Ex. 1 ¶ 19.[43]   The Transition Statute's provision for approval of routine business decisions by the National Assembly only confirms the State's direct "total control" over PDVSA.   *See* Gomez Report, Ex. 1 ¶ 12.   Indeed, in 2019, PDVSA was instructed not to pay its debts **on the Interim**

---

[43] Recent amendments to the Transition Statute now allow the National Assembly to "authorize the appointment and/or removal of … ad-hoc Administrative Boards…of State companies," such as PDVSA.  Gomez Report ¶ 10.  But this does not distance PDVSA from the political whims of the State.  The amendments preserve the authority and control that Venezuela as a State exerts over PDVSA, allowing the government's Transition Statute to trump preexisting laws and corporate documents.  *Id.* ¶ 13.

***Government's Orders***.[44]   As Luis Pacheco, the then-Chairman of the *ad hoc* PDVSA board, acknowledged in November of 2020, PDVSA's decision making was subservient to Venezuela's direction: "PDVSA's obligation [in the bond proceedings] was to support what the National Assembly, the only legitimately elected body in Venezuela, determined."[45]   Furthermore, the Guaidó Government established a special fund derived from assets in the United States previously controlled by the Maduro Government, earmarked for use in litigation involving PDVSA, such as this case.  *See* Gomez Report, Ex. 1 ¶ 22.[46]

The extent of Venezuela's control over PDVSA is symptomatic of the lack of PDVSA's corporate formalities.  Ad hoc PDVSA maintains no physical office space.  Its website was hardly more than a shell that has since been deactivated.[47]   And PDVSA's ad hoc board is uncompensated,[48] working solely for the "satisfaction of contributing to the ***rebuilding of the country***" and "the main objective" of "return[ing] democracy to Venezuela."[49]

---

[44] Presentation of results 2019 – 2020, PDVSA Ad Hoc Board of Directors, at 12 ("Yanos Decl., Ex. 37").

[45] "Luis Pacheco: 'If we had not sued, the bondholders would have had a party and taken Citgo,'" EMBASSY OF BOLIVARIAN REPUBLIC OF VENEZUELA, at 3–4 (Nov. 17, 2020) ("Yanos Decl., Ex. 34").

[46] Indeed, Venezuela and PDVSA interchangeably use the same lawyers.  Venezuela's counsel below also represented PDVSA in the parallel proceedings of *Northrop Grumman Ship Systems, Inc. v. Ministry of Defense of the Bolivarian Republic of Venez.*, No. 1:20-mc-257 (D. Del.). Indeed, in Venezuela's brief in opposition to Plaintiffs' Motion for Summary Judgment, a telling typo referred to Venezuela as "PDVSA."  *See* Venezuela's Memorandum in Opposition to Summary Judgment, *Koch Minerals Sàrl, et. al. v. Bolivarian Rep. of Venez.*, No. 1:17-cv-02559-ZMF, D.I. 53 at 1 (Apr. 5, 2021) (Yanos Decl. Ex. 35).

[47] *Compare* "Presentación de resultados 2019 – 2020, Junta Administradora Ad Hoc De PDVSA" (Yanos Decl. Ex. 36) (presentation downloaded from the Ad Hoc PDVSA website in 2021), *with* The Ad Hoc Administrative Board of Petróleos de Venezuela, S.A., http://pdvsa-adhoc.com/ (last visited September 7, 2022) (Yanos Decl. Ex. 38).

[48] "Venezuela's opposition names new members to PDVSA ad-hoc board," REUTERS at 3 (June 30, 2020) (Yanos Decl. Ex. 18).

[49] Yanos Decl., Ex. 34 at 7 (emphasis added).

* * *

As shown above, the Guaidó administration has continued the tradition of extensively controlling PDVSA for political gain.  "More than ever before, PDVSA is [Mr.] Guaidó's main bargaining chip vis-à-vis Maduro and even his own allies," Professor Gomez concludes.  Gomez Report ¶ 13.  "So far, [Mr. Guaidó's] interim government has done everything in its power to keep it that way and nothing suggests that such situation will change anytime soon."  *Id.*  Indeed, Mr. Guaidó's control over PDVSA and its assets is so extensive, it has triggered rebuke from former cabinet members, political parties, and the judiciary branch.  *See Id.* ¶¶ 6–12.

While the United States continues to recognize the Guaidó administration as the head of the Venezuelan State, some levels of diplomacy have occurred between the United States and the Maduro regime in the past several months.[50]  If the United States were to make a shift in policy in the coming months to formally recognize the Maduro regime, it would not affect PDVSA's alter ego status.  Maduro continues to use PDVSA as an extension of his regime, appointing close political allies.  *See supra* pg. 10–11.

### C.    Used For Commercial Activity

Not only has the Guaidó administration maintained total control over PDVSA, the property at issue—stock in PDVH—continues to be used for a commercial activity and is therefore not immune from attachment.  *See* 28 U.S.C. § 1610(a)(6).  Mr. Guaidó's *ad hoc* PDVSA board continues to use its PDVH shares to run its business.  The Third Circuit confirmed this point in its decision affirming this Court's alter ego finding from *Crystallex*, which among other things noted

---

[50] *See* Marianna Parraga, et al., "UPDATE 2-U.S., Venezuela discuss easing of sanctions, make little progress -sources," Reuters (Mar. 6, 2022) ("Yanos Decl. Ex. 40") ("A U.S. delegation led by Juan Gonzalez - the top White House Latin America adviser - and Ambassador James Story held talks at the Miraflores palace with socialist President Nicolas Maduro and his Vice President, Delcy Rodriguez").

that "President Guaidó in February 2019 appointed an *ad hoc* administrative board to represent PDVSA in its capacity as sole shareholder of PDVH for appointing a new board of directors of that entity." *See Crystallex Int'l Corp*., 932 F.3d at 151.  As a result, "the shares continue to be used in commerce." *Id.*  Venezuela has since exercised that same commercial power when Mr. Guaidó appointed additional directors to both PDVSA's and CITGO's board in summers of 2020 and 2021.[51]  In their own 2020 Bond proceeding briefings, Mr. Guaidó's PDVSA board has confirmed that it continues to manage subsidiaries though PDVH.  *See* Yanos Decl. Ex. 16 at 31.

III.     **The United States 2020 Statement of Interest In *Crystallex* Confirms The Continuing Alter Ego Relationship Between PDVSA And The Venezuelan State.**

        That PDVSA continues to function as Venezuela's alter ego is uncontroversial.  In fact, the submissions of the United States before this Court and in the broader policy arena confirm that the United States itself recognizes the continuing and fundamental identity of PDVSA with the Venezuelan State.

        In a Statement of Interest filed in the *Crystallex* case, the United States admits that its goal in calling for restraint as to any auction of PDVH shares is to forestall the perception that the Guaidó administration cannot protect ***Venezuela's*** assets.  Statement of Interest of the United States of America, *Crystallex Int'l Corp. v. Bolivarian Republic of Venez*., No. 1:17-mc-00151-LPS (D. Del. July 16, 2020), D.I. 212-1 at 3; Reply Brief In Support of the Statement of Interest of the United States, *Crystallex Int'l Corp. v. Bolivarian Republic of Venez*., No. 1:17-mc-00151-LPS (D. Del. July 16, 2020), D.I. 220 at 8 ("Should these assets be advertised for public auction at this time, the Venezuelan people would seriously question the interim government's ability to protect ***the nation's assets***, thereby weakening it and U.S. policy in Venezuela today." (emphasis

_____

[51] Yanos Decl. Ex. 18; "Venezuela's Guaidó names Citgo chief executive to board," REUTERS (July 9, 2020) (Yanos Decl. Ex. 24).

added)).  The same understanding is clearly reflected in the United States' sanctions applicable to Venezuela, which continue to define "Government of Venezuela" to include PDVSA.  *See*, *e.g.*, Executive Order No. 13857, 84 Fed. Reg. 509, 509–10 (Jan. 25, 2019) (amending the definition of "Government of Venezuela" in prior Executive Orders *explicitly to include PDVSA*) and Executive Order No. 13884, 84 Fed. Reg. 38843, 38843–45 (Aug. 5, 2019) (blocking the property of "the Government of Venezuela," which includes PDVSA).  Where the Executive Branch, with its foreign policy and intelligence apparatus, has equated PDVSA with the Venezuelan State, this Court should feel comfortable drawing the same conclusion.

## IV.    Granting Plaintiffs' Motion Does Not Conflict With The United States Venezuela Sanctions Or Broader Foreign Policy Goals.

Venezuela Sanctions Regulations prohibits, without a special license, "the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to *transfer or otherwise alter or affect* [blocked] property or interests in [blocked] property." 31 C.F.R. § 591.407 (emphasis added). In other words, it is the establishment of a property interest or the modification of an existing property interest in blocked assets that is prohibited without a license.  Plaintiffs have applied to OFAC for a license authorizing its attachment of PDVH shares and will keep the Court advised its status.

Many pages of briefing in parallel attachment proceedings have litigated whether the current sanctions regime permits this Court from granting the conditional relief Plaintiffs now seek.  Earlier this year, the Court put to rest the question to rest.  On March 2, 2022, this Court held that OIEG and Huntington Ingalls' request for attachment conditioned upon the eventual issuance of an OFAC license did not run afoul of the United States' sanctions regime.  *See OI European Grp. B.V. v. Bolivarian Rep. of Venez.*, No. 19-290-LPS, 2022 U.S. Dist. LEXIS 36631,

at *17–25 (D. Del. Mar. 2, 2022). The Court's decision was correct. Granting Plaintiffs' Motion for conditional relief would not create or perfect any legal or equitable interests.

## **CONCLUSION**

For the above reasons, Plaintiffs respectfully request that this Court grant their Motion For A Writ Of Attachment *Fieri Facias*; order that the Clerk of this Court is authorized to affix its original signature and seal on Plaintiffs' proposed writ of *fieri facias* and, only upon evidence that the Office of Foreign Assets Control has either (*i*) authorized the issuance and service of such writ or (*ii*) otherwise removed or modified the relevant sanctions currently prohibiting the transfer of PDV Holding, Inc., the Clerk of this Court shall issue such writ to PDVH in aid of Plaintiffs' execution of their consolidated judgment against Defendant Bolivarian Republic of Venezuela; and grant such other and further relief as the Court deems just and proper.

DATED: October 7, 2022                  Respectfully submitted:

<u>OF COUNSEL</u>:                              */s/ Laura Davis Jones* _____
Alexander A. Yanos *pro hac vice pending*      Laura Davis Jones (DE Bar No. 2436)
Rajat Rana *pro hac vice pending*              Peter J. Keane (DE Bar No. 5503)
Robert Poole *pro hac vice pending*            Pachulski Stang Ziehl & Jones LLP
ALSTON & BIRD, LLP                             919 North Market Street, 17th Floor
90 Park Avenue, 15th Floor                     P.O. Box 8705
New York, NY 10016-1387                        Wilmington, DE 19899-8705
212-210-9400                                   (302) 652-4100
alex.yanos@alston.com                          ljones@pszjlaw.com
rajat.rana@alston.com                          pkeane@pszjlaw.com
robert.poole@alston.com

                                               *Attorneys for Plaintiffs*